**NUMBER: 25-11488-J**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**RHONDA JACKSON,**

      **Plaintiff-Appellant,**

**v.**

**SUMTER COUNTY, GEORGIA,**

      **Defendant-Appellee.**

---

**On Appeal from the United States District Court**
**for the Middle District of Georgia, Albany Division**
**Case No. 1:22-cv-00207-LAG**

---

# PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT, RHONDA JACKSON

---

Gregory O. Wiggins
Wiggins Childs Pantazis Fisher
    & Goldfarb, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205/314-0500
gwiggins@wigginschilds.com
*COUNSEL FOR PLAINTIFF-APPELLANT*

NUMBER: 25-11488-J
IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

RHONDA JACKSON,

Plaintiff-Appellant,

v.

SUMTER COUNTY, GEORGIA,

Defendant-Appellee.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Rhonda Jackson, Plaintiff-Appellant, submits the following list of persons or entities which, upon information and belief of counsel for Appellants, have or may have an interest in the outcome of this case:

1.     William Greg Dobson, Lober & Dobson, LLC, Counsel for Plaintiff-Appellant.

2.     Honorable Leslie Abrams Gardner, Chief District Judge.

3.     Rhonda Jackson, Plaintiff-Appellant.

C-1

4.     A. Danielle McBride, Lober & Dobson, LLC, Counsel for Plaintiff-Appellant.

5.     Raleigh W. Rollins, Alexander & Vann, LLP, Counsel for Defendant-Appellee.

6.     Henry Thomas Shaw, Alexander & Vann, LLP, Counsel for Defendant-Appellee.

7.     Sumter County, Georgia, Defendant-Appellee.

8.     Gregory O. Wiggins, Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC, Counsel for Plaintiff-Appellant.

Plaintiff- Appellant in this appeal is an individual. Plaintiff-Appellant has no knowledge of the Defendant-Appellee's parent companies, subsidiaries, partners, limited liability entity members and managers, trustees, affiliates or similar entities.

Respectfully submitted,


/s/ *Gregory O. Wiggins*
Gregory O. Wiggins
Wiggins Childs Pantazis Fisher & Goldfarb, LLC.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
gwiggins@wigginschilds.com
*Counsel for Plaintiff-Appellant*


C-2

## CERTIFICATE OF SERVICE

I hereby certify that there are no known non-CM/ECF participants for mailing by United States Postal Service, and that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system on this 4th day of November 2025, which will send notification of such filing to the following:

Raleigh W. Rollins
H. Thomas Shaw
Alexander & Vann, LLP
411 Gordon Avenue
Thomasville, GA 31792

/s/ *Gregory O. Wiggins*
OF COUNSEL

C-3

## <u>STATEMENT ON ORAL ARGUMENT</u>

Jackson does not request oral argument.

## <u>CERTIFICATE OF TYPE SIZE AND STYLE</u>

Pursuant to Eleventh Circuit Rule 28.1 (d) the following is the type size and styled used in this brief:

Times New Roman 14 pt.

ii

## TABLE OF CONTENTS

**PAGES:**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ....................................... i

CERTIFICATE OF TYPE SIZE AND STYLE ........................................... ii

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ............................................................. v

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF ISSUES ............................................................... 1

STATEMENT OF CASE ................................................................. 1

    A.    Course Of Proceedings And Disposition Below ................................... 1

    B.    Statement Of Facts ................................................................ 2

        I.  Introduction ...................................................................... 2

        II.  Appellee's Policies and Procedures .............................................. 10

            A.   Harassment Policy .......................................................... 10

            B.   Policy Regarding Disciplines and Termination ..................... 12

        III.  Contradictions in Harris' Affidavit and
              Deposition Testimony ........................................................ 13

        IV.  Contradictions in Volley's Affidavit and
              Deposition Testimony ........................................................ 18

V.    Retaliation Claim ................................................................. 22

C.    Statement of Standard For Review ...................................................... 24

SUMMARY OF ARGUMENT ......................................................................... 24

ARGUMENT ....................................................................................................... 26

A.  The District Court Erred in Dismissing Plaintiff's
Disability Discrimination Claim ................................................. 26

    1.  The Timeline Used by the District Court Supports
Plaintiff-Appellant's Convincing Mosaic Theory ................................. 29

    2.  There Was Abundant Evidence That the Decision-
Makers Had Knowledge of Plaintiff-Appellant's
Disability and the District's Court's Contrary Finding
Is Erroneous ........................................................................ 35

    3.  Plaintiff-Appellant Presented Other Evidence Showing
That She Was Terminated Because of Her Disability ......................... 39

    4.  There is Evidence of Pretext ................................................ 43

B.  The District Court Erred in Dismissing Plaintiff-Appellant's
Retaliation Claim ................................................................. 46

    1.  Plaintiff-Appellant's Grievance was Protected Activity ..................... 46

    2.  Plaintiff-Appellant' Engaged in Other Protected
Activity Including Her Meeting With Volley and
Harris When She Disclosed Her Disability and
Engaged in the Interactive Process ....................................... 49

iv

CONCLUSION ...................................................................................................... 52

CERTIFICATE OF COMPLIANCE ..................................................................... 53

CERTIFICATE OF SERVICE............................................................................... 54

v

# TABLE OF AUTHORITIES

**PAGES:**

*Belgrave v. Publix Market,*
2023 U.S.App.LEXIS 11889, *( (11th Cir. May 16, 2023) ................................... 51

*Carter v. Three Springs Residential Treatment,*
132 F.3d 635 (11th Cir. 1998) ....................................................................... 24

*Chapter 7 Trustee v. Gate Gourmet, Inc.,*
683 F.3d 1249, 1256 (11th Cir. 2012) ............................................................ 28

*Combs vs. Plantation Patterns,*
106 F.3d 1519, 1528 (11th Cir. 1997) ............................................................ 44

*Flowers v. Troup Cty, Ga. School Dist.,*
803 F.3d 1327, 1336 (11th Cir. 2015) ............................................................ 27

*Frazier-White v. Gee,*
818 F.3d 1249, 1258 (11th Cir. 2016) ............................................................ 51

*Hamilton vs. Montgomery County Bd. of Educ.,*
122 F.Supp. 1273, 1281 (M.D. Ala. 2000) ....................................................... 43

*Hamilton v. Southland Christian School, Inc.,*
680 F.3d 1316, 1320 (11th Cir. 2012) ............................................................ 28

*Hilburn v. Murata Electronics, N.Am, Inc.,*
181 F.3d 1220, 1226-27 (11th Cir. 1999) ....................................................... 27

*Lewis vs. City of Union City,*
877 F.3d 1000, 1018 (11th Cir. 2017) ............................................................ 28

vi

*McDonnell-Douglas,* .................................................................... 24,26,28,29,42

*Miles vs. M.N.C. Corp.,*
750 F.2d 867 (11th Cir. 1985) ................................................................. 44

*Sheridan v. Dupont,*
100 F.3d 1061, 1072 (3d Cir. 1996) ........................................................ 44

*Silverman v. Bd. of Educ. of City of Chicago,*
637 F.3d 729, 733-34 (7th Cir. 2011) ..................................................... 28

*Smith v. Lockheed-Martin Corp.,*
644 F.3d 1321, 1328 (11th Cir. 2011) ................................................. 27,28

## OTHER STATUTES:

ADA and the Rehabilitation Act of 1973 ..................................... 1,24,26,27,46,51,52

## Jurisdictional Statement

Appellate jurisdiction exists under 28 U.S.C. §1291 as an appeal from a final judgment covering all claims and parties.

## Statement of the Issues

Did the District Court err in granting summary judgment against Plaintiff-Appellant on her disability discrimination claim(s) under the Rehabilitation Act and ADA?

Did the District Court err in granting summary judgment against Plaintiff-Appellant on her relation claim?

Did the District Court err in granting summary judgment against Plaintiff-Appellant by failing to view the evidence in a light most favorable to the non-moving party?

Did the District Court err in granting summary judgment against Plaintiff-Appellant by failing to consider any of Plaintiff-Appellant's undisputed facts in reaching its decision?

## Statement of the Case

### A.    Course of Proceedings and Disposition Below

Plaintiff-Appellant, Rhonda Jackson ("Jackson" or "Appellant") filed her complaint against Defendant-Appellee, Sumter County Georgia ("Sumter County"

1

of "Appellee") on December 8, 2022 (Doc. 1). Appellee answered the Complaint on January 30, 2023 (Doc. 8). Appellant filed an Amended Complaint on February 13, 2023 (Doc. 9). Appellee answered the Amended Complaint on July 19, 2023 (Doc. 13). Discovery was concluded on November 30, 2023 (Doc. 18). Appellee filed its Motion for Summary Judgment on January 2, 2024 (Doc. 19). Jackson filed her Opposition to said Motion on February 23, 2014 (Doc. 24). Sumter County filed its Rely on March 26, 2024 (Doc. 29). On March 31, 2025 (Doc. 38), the District Court entered an Order and Memorandum Opinion granting Appellee's Motion for Summary Judgment. On April 30, 2025, Jackson timely filed her Notice of Appeal (Doc. 40).

### B.    Statement of Facts

#### I.    Introduction

Appellant was first hired with Sumter County on March 14, 2014, into the position of Administrative Assistant and remained in that position until her discharge on April 26, 2022. (Doc. 19-43, p. 19:2-14). During her employment, Jackson had three supervisors: Bill Twomey (Twomey), Janice Jarvis (Jarvis), and Rayetta Volley (Volley). (Doc. 19-43, p. 20:15-20; Doc. 23-3, ¶2).

During her employment, Jackson suffered many medial issues, namely, Chronic Kidney Failure-Stage 4; COPD; and Congestive Heart Failure. (Doc. 19-

2

43, p. 32:23-25; Doc. 23-3, ¶3). Despite all of her medical issues, with the assistance of medication, Jackson was able to perform all of her job duties while employed with Appellee. (Doc. 19-43, pp. 33:6-42:9; Doc. 23-3, ¶4).

During her employment, Jackson informed Janis Jarvis, her supervisor at the time, of her medical conditions. (Doc. 19-43, pp. 42:10-43:5; Doc. 23-3, ¶5). From 2015 until her termination, Jackson was required to miss a considerable amount of work due to her medical conditions. Appellee was aware of Jackson's medical conditions due to the fact she was constantly being out of work due to being in and out of the hospital. (Doc. 19-43, pp. 43:13-44:7; Doc. 23-3, ¶6).

On June 23, 2017, Jackson was written up and placed on a Performance Improvement Plan (PIP) by Bill Twomey, her supervisor, for being absent from work. (Doc. 23-4; Doc. 23-3. ¶12). As a result of the write up, Jackson told Twomey about her medical issues. (Doc. 19-43, pp. 55:8-56:9; Doc. 23-3, ¶13). The purpose of the PIP was to emphasize and summarize the seriousness of the Appellant's poor attendance record over the last six months. (Doc. 23-4). The write up stated: "[w]e **do acknowledge the receipt of various medical excuses that have been submitted,** but it still reflects against your overall attendance." (Doc. 23-4, emphasis added).

As a result of Jackson's poor attendance, she was placed on a 90-day PIP. Jackson successfully completed said PIP. (Doc. 23-4; Doc. 23-3, ¶16). This PIP directly contradicts Harris' Memo of April 12th, as well as her Affidavit, wherein she testified that there is no medical documentation on file to support Jackson's medical issues. (Doc. 19-6; Doc. 19-21, ¶¶43 & 46; Doc. 23-3, ¶17).

As a result of her medical conditions and Covid-19, Jackson's physicians required her to take extra preventative measures to ensure she did not get Covid-19. (Doc. 19-43, pp. 45:19-46:9, 46:10-23; Doc. 23-3, ¶8, Doc. 19-12; Doc. 19-13).

When Covid hit in 2020, Jackson began spraying her working area(s) with Lysol, wiping down desks and other surfaces with Clorox wipes and wearing masks. (Doc. 19-43, p. 46:10-23; Doc. 23-3, ¶9). Despite the fact that numerous employees and management employees passed through Jackson's office on a daily basis, she was **never instructed** not to spray Lysol in her office. (Doc. 19-43, p. 50:9-11; Doc. 23-3, ¶11).

Up until March 29, 2022, there was a note outside the door of the BOC Suite where Jackson was stationed that instructed employees that it was **mandatory** to put on a mask when entering the Suite. (Doc. 19-43, pp. 7-12; Doc. 19-32, p. 2). However, on March 29, 2022, Jackson was informed by Volley that the Commission

4

changed the requirement from "mandatory" to "**recommended**." (Doc. 19-43, pp. 48:21-49:1).

During the first few months of 2022, despite the mandatory requirement to wear a mask when entering the BOC Suite, Jimenez and Williams would enter the BOC Suite not wearing a mask. (Docs. 19-8 and 19-9).

In approximately September 2021, Janice Jarvis ceased being Jackson's supervisor and Volley took over in January of 2022. (Doc. 19-43, pp. 58:22-59:8; Doc. 23-3, ¶19). Once Volley became her supervisor, Jackson told Volley about why she was absent from work so much and her medical issues. (Doc.19-43, pp. 50:10-20, 56:19-57:16; Doc. 23-3, ¶¶18, 20).

In December 2021, Volley, in a meeting, warned Jackson as well as other employees that if they had a problem, they needed to come to her first and not go to the commission. If they went to the commission, she was going to be very upset. Jackson took this comment from Volley as a threat. (Doc. 19-43, pp. 66:10-67:21; Doc. 23-3, ¶21).

Nancy Jimenez (Jimenez) and Angela Williams (Williams) filed their complaints against Jackson on March 11th and March 21st, respectively, with Harris. Not one employee, including Jimenez and Williams, ever complained that Jackson was creating a hostile work environment. Not one employee ever complained that

5

Jackson was harassing them due to her spraying Lysol when they entered her work space. Not one employee ever complained they were unable to perform their daily job duties because Jackson was spraying Lysol.

Harris met with Williams on March 14, 2021. (Doc. 19-25). Williams had not made a complaint prior to March 14th, and did not make her first complaint until March 21, 2021, when Jackson was out on FMLA leave. (Doc. 19-29).

Jimenez made her first complaint to Harris concerning Jackson spraying Lysol on March 11th and, in her complaint, she copied Williams. (Doc. 19-8, p. 5). Harris swears at ¶¶16-17 of her Affidavit that she met with Jimenez and Williams on March 14th and ". . . took notes contemporaneous to these meetings that summarized our conversations," and a true and accurate copy of the notes are attached as Exhibits D and E to her Affidavit. (Doc. 19-21).

Harris' deposition contradicts ¶¶16-17 of her Affidavit. Beginning at p. 14 line 18 of her deposition, Harris is questioned about her handwritten notes of her interview with Jimenez and Williams. (Doc. 23-2, p. 14:18-15:1). Harris testified that Jimenez never complained about being harassed but that was the way Harris had interpreted it. (Doc. 23-2, pp. 16-24). Harris admits that she (Harris) never put in her notes that Jimenez said she was being harassed. (Doc. 23-2, pp. 16-18).

6

Harris was asked, in her deposition, whether anywhere in Jimenez's notes did she (Jimenez) state she felt intimidated. Harris first testified that Jimenez put that she was intimidated in her handwritten notes. The word "intimidated" does not appear anywhere in Jimenez's notes. (Doc. 23-2, pp. 21, 24).

Counsel then read Jimenez's notes to Harris and Harris finally admits the word "intimidated" is nowhere in said notes and that this was only her interpretation of what Jimenez was saying. (Doc. 23-2 p. 21).

Finally, Harris was asked:

> Q:     Well, if she (Jimenez) felt like she was being harassed or that she was intimidated, don't you think she would have put that in her statement? Because those are two critical points, are they not?
>
> Harris refused to give a responsive answer, so she was asked again.
>
> Q:     Well, let me ask you, is the fact that you're testifying today that she was harassed and intimidated, would you consider those to be critical points in her complaint?
> A:     I do, yes.
> Q:     And she doesn't mention those two words, does she?
> A:     No, she does not, in those – in her statement, she does not
>
> . . .
>
> Q:     All she said was that it makes her uncomfortable. It doesn't say anything about her not being able to perform her job duties, does it?
> A:     No, it doesn't say that.

7

(Doc. 23-2, pp. 24-25).

Harris then testifies:

> Q:     If she says she felt like she was being harassed and you're
> going to investigate Ms. Jackson for harassment, don't you think
> she (Jimenez) should have at least said she felt like she was being
> harassed?
> A:     Yes.

(Doc. 23-2, pp. 14:18-27:19).

In the instant case, the gravity of the offense was, at best, non-existent. Spraying Lysol to protect one's health can hardly be considered an offense that would create a hostile work environment. Jackson sprayed Lysol when other employees, including managerial employees, entered her work area. Nobody ever complained about Appellant spraying Lysol in her work area. As far as "considering the employee's disciplinary history," Jackson had only been disciplined one time during her entire employment. (Doc. 19-43, pp. 55:18-56:2).

Harris was the "gatekeeper" for FMLA. (Doc. 19-43, p. 10:14-16). Despite being the "gatekeeper" for people on FMLA and despite Jackson being out on FMLA, Harris contends she was unaware of Jackson's medical condition. (Doc. 19-21, ¶32). Appellant was on FMLA leave from March 15th until March 27th. (Doc. 19-43, p. 80:16-17; Doc. 23-3, ¶24). Harris did not meet with Appellant until March 28th. (Doc. 19-21, ¶¶25-26).

8

While Appellant was out on FMLA leave, Harris completed her application for FMLA leave and asked that Jackson's FMLA be extended on March 16, 2022. (Doc. 19-43, Doc. 23-5).[1] Despite her (Harris') prior repeated testimony that she did not know of Jackson's medical issues, on page 2 of the FMLA paperwork, Harris marked that Jackson needed FMLA leave due to her "own serious health condition." (Doc. 19-43, pp. 81:3-82:16).

On March 28th, Harris met with Jackson and told her a complaint had been lodged against her for spaying Lysol. (Doc. 19-21, ¶¶26, 27). Jackson was surprised because no one in management had said anything to her about spraying Lysol. (Doc. 19-43, p. 84:20-10; Doc. 23-3, ¶27). Jackson did not deny that she sprayed Lysol; however, she was shocked a complaint had been made because no one had ever complained to her about spraying Lysol. (Doc. 19-43, pp. 85:7-86:3; Doc. 23-3, ¶28).

Jackson was given an opportunity to respond to the complaint and she provided a written response on March 31st. (Doc. 19-32; Doc. 23-3, ¶29). In her response, Jackson denied the allegations made by the two complainants and once again explained that she had medical conditions and was not trying to harass anyone. She was simply taking **safety precautions** to protect her health. (Doc. 19-32).

---

[1] Appellant submitted Jackson's deposition but did not submit the exhibits. Jackson submitted said document as Doc. 23-5.

Because of her medical conditions, Jackson was more vulnerable to Covid-19, and she took preventive measures in order to ensure she did not contract same. Jackson wore a mask at all times and would spray Lysol anytime anyone came into the BOC Suite. (Doc. 19-43, pp. 45:19-46:23, 48:7-49:13).[2]

## II. Appellee's Policies and Procedures

### A. Harassment Policy

Appellee's Harassment Policy states:

> "[u]nlawful harassment is prohibited by this policy and consists of verbal or physical conduct that is abusive toward an individual. Such prohibited harassment may occur because of the individual's race, color, sex, age, religion, national origin, disability, veteran's status, or other prohibited reason that has the purpose or effect of (1) creating an intimidating, hostile or offensive working environment, (2) unreasonably interfering with an individual's work performance, or (3) otherwise adversely affecting an individual's employment opportunities."

(Doc. 19-14, p. 45, §21).

There is no evidence that the alleged harassment occurred due to the complainants' race, color, sex, age, religion, national origin, disability, veteran's status, or other prohibited reason.

---

[2] Jackson was absent from work on FMLA leave while she was in the hospital from March 15th - 27th and returned to work on March 28th. (Doc 19-43, p. 80:9-22).

Not one employee ever complained that Appellant's spraying Lysol (1) created an intimidating, hostile or offensive working environment, (2) unreasonably interfered with their work performance, or (3) otherwise adversely affecting an individual's employment opportunities. (Doc. 19-4, p. 45).

According to Volley, Sumter County follows a progressive policy - first verbal warning, which would be placed in employee's file; then a written warning; and then possible termination, if warranted. (Doc. 23-1, pp. 14:13-15:6).

Prior to an employee being discharged, unless it's a major offense, they should receive a written warning. (Doc. 23-1, p. 17:2-6). When Appellant was discharged, she had never received a written or verbal warning concerning her spaying Lysol in her work area. Appellee failed to follow its own Progressive Discipline Policy.

Paragraph 12(a) of the same Policy states: "Discharges for disciplinary reasons shall occur **only after** the Supervisor or Department Head have counseled the employee, explained how the employee needs to improve, and stipulated a time or times for further evaluation. Failure of the employee to improve as required may result in discharge." (Doc. 19-4, Disciplinary Actions, §12(4), p. 24).

According to Harris, the Disciplinary Policy in place, Doc. 19-4, Disciplinary Actions, §12(4), p. 24, is the "normal process that should be followed when discharging an employee. (Doc. 23-2, pp. 12:14-13:9).

11

Appellee failed to follow its own policies because Jackson was never "counseled about spraying Lysol, explained how she needed to improve, or given a stipulated time or times for further evaluation" prior to being discharged.

Doc. 19-4 - Disciplinary Actions, §12, p. 22, states: "[t]he severity of the disciplinary action imposed should be related to the: (1) the gravity of the offense committed; (2) the employees discipline history; and (3) the disciplinary action imposed in similar cases." (Doc. 19-4).

### B.    Policy Regarding Disciplines and Termination

¶12a of the same Policy states: "[d]ischarges for disciplinary reasons shall occur **only after** the Supervisor or Department Head have counseled the employee, explained how the employee needs to improve, and stipulated a time or times for further evaluation. Failure of the employee to improve as required may result in discharge." (Doc. 19-4, Disciplinary Actions, §12(4), p. 24).

According to Harris, the Disciplinary Policy in place, Doc. 19-4, Disciplinary Actions, §12(4), p. 24, is the "normal process that should be followed when discharging an employee. (Doc. 23-2, pp. 12:14-13:9).

Appellee failed to follow its own policies because Jackson was never "counseled about spraying Lysol, explained how she needed to improve, or given a stipulated time or times for further evaluation" prior to being discharged.

12

**III.    Contradictions in Harris' Affidavit and Deposition Testimony**

Harris' Affidavit (Doc. 19-21, ¶41) states: "[t]o my knowledge, the initial meeting[3] was the first time **anyone with Sumter County** was made aware that Plaintiff had COPD and Chronic Kidney disease that caused her to be more vulnerable to Covid-19." (Doc. 19-21).

Harris swears that when she met with Jimenez and Williams she ". . . took notes contemporaneous to these meetings that summarized our conversations. A true and accurate copy of the notes are attached at exhibits D and E" to her Affidavit. (Doc. 19-21).

Harris was asked, in her deposition, whether anywhere in Jimenez's handwritten notes did she complain about Jackson harassing her. Harris finally testified that Jimenez never complained about being harassed. (Doc. 23-2, pp. 16-24). Harris admits that nowhere in her notes does Jimenez testify that she was being harassed. (Doc. 23-2, pp. 16-18).

Volley also submitted an Affidavit in support of Defendant's motion. Volley was deposed on October 10, 2023. Appellee failed to supply the Court with Volley's

---

[3] It is unclear in Harris' Affidavit when this alleged Initial Meeting took place. Harris made the same statement at ¶32.

13

deposition, but instead decided to provide the Court with an Affidavit prepared by her attorney after consultation with Volley. (Doc. 19-3).

In her Affidavit, Volley states, at ¶13, "[o]n or about April 12, 2022, the HR Director for Sumter County, Deatrice Harris, informed me that she had completed here investigation into complaints against Jackson for violation of the Harassment Policy." (Doc. 19-3; emphasis added). Despite the fact that not one employee had made any complaint about being harassed, working in a hostile work environment, not being able to perform their job duties, Harris found Jackson had violated said policy. (Docs. ##19-23 and 19-29).

Volley swears in ¶16 of her Affidavit that Harris found Appellant's conduct amounted to a violation of the "harassment policy … and had created a hostile work environment." (Doc. 19-3). However, based on the harassment policy, Jackson's conduct did not violate the harassment policy. (Doc. 23-3, ¶30).

Despite what the Discipline Policy states at Doc. 19-4, in Doc. 19-3, in ¶52 of her Affidavit, Volley states: "I was not aware of the Plaintiff being charged with similar conduct in the past." Volley, decided to ignore the Discipline Policy and terminate Appellant.

At ¶37 of her Affidavit, Volley sets out what the Harassment Policy states. The policy states "[s]uch prohibited harassment **may occur** because of an individual's

14

race, color, sex, age, religion, national origin, disability, veteran's status or other prohibited reason." (Doc. 19-3, emphasis added).

Volley then states, at ¶38 of her Affidavit, "[m]y understanding now, and at all relevant times to this Lawsuit, is that, according to the Harassment Policy, any conduct that has the effect of creating 'creating an intimidating, hostile or offensive working environment;' unreasonably interfering with an individual's work performance; or otherwise adversely affecting and individual's employment opportunities" can amount to harassment, ***REGARDLESS*** **of whether the conduct is done because of an individual's race, color, sex, age, religion, national origin, disability, veteran's status or other prohibited reason."** (Doc. 19-3, emphasis added).

**Nowhere** **in the policy does it state "REGARDLESS" of whether the conduct is done because of an individual's race, color, sex, age, religion, national origin, disability, veteran's status, or other prohibited reason** (Doc. 19-14).

Based on Appellee's policies, Harris had only recommended Jackson receive a written reprimand. (Doc. 19-37, p. 2). However, Volley, after Jackson filed her grievance on April 22nd, overrode Harris' recommendation and terminated Jackson on April 26th. (Doc. 19-38).

15

During Jimenez's interview with Harris concerning her complaint about Jackson spraying Lysol, she stated when asked:

> (Q) "What do you want to happen . . .
> (A) . . . stop the behavior, respect because it's offensive."

(Doc. 19-25).

During Williams' interview with Harris concerning her complaint about Jackson spraying Lysol, she stated when asked:

> (Q) "What do you want to happen . . .
> (A) . . . respect, ask her to wear a mask but stop spraying Lysol on me."

(Doc. 19-26).

There is absolutely zero evidence that Jimenez or Williams believed Jackson should be terminated from her employment, that they were working in a hostile working environment, that they were being harassed, that they were being intimidated, or that they could not perform their job duties as a result of Jackson spraying Lysol in her work area. (Docs. 19-23, 19-25, 19-26 and 19-29).

Harris states in ¶33 of her Affidavit that after reviewing Jackson's response of March 31st, reviewing statements from Jimenez, Willliams, and McCants, she found Jackson not to be credible. (Doc. 19-21).

Nowhere, in her deposition, did Harris ever state or insinuate that she found Jackson not to be credible.

16

In ¶36, Harris states "[o]n or about April 12, 2022, I informed Volley of the complaints against Plaintiff … and provided Volley with the April 12th letter. (Doc. 19-21).

In ¶41 of her Affidavit, Harris swears "to my knowledge, the "**Initial** Meeting" (which had to be after Jackson's March 31st letter and after her PIP on June 23, 2017) was the first time anyone with Sumter County was made aware that Jackson "had COPD or chronic kidney disease that caused her to more vulnerable to COVID." (Doc. 19-21).

Appellant, in her March 31st letter to Harris, informed Harris that she had underlying medical issues. (Doc. 19-32). Harris states in her Affidavit that she met with Jackson on March 28th. (Doc. 19-21, ¶28). During the March 28th meeting, Harris asked Jackson to provide her with a written statement in response to the complaints against her. (*Id.*)  Nowhere in her Affidavit does Harris state that in the March 28th meeting she informed the Jackson she had violated the Harassment policy.

Jackson provided Harris with a written explanation on March 31st. (Doc. 19-21, ¶30).  Jackson informed Harris in her March 31st letter of her underlying medical issues. (Exhibit "K" along with ¶¶31, 32 of Doc. 19-21) After reviewing Jackson's statement, … Harris, on **April 12th, for the first time,** wrote, "I summarized my

17

finding with regard to the Investigation and provided my recommendation as to the discipline to be given to the plaintiff." (Doc. 19-21, ¶34). Clearly, Volley's statement that Jackson **did not raise the issue of her underlying health condition** until **she was informed that Harris had found that she had violated the harassment policy …" is false.**

IV.    **Contradictions in Volley's Affidavit and Deposition Testimony**

In her Affidavit, Volley states, at ¶13, "[o]**n or about April 12, 2022**, the HR Director for Sumter County, Deatrice Harris, informed me that she had **COMPLETED** an investigation into complaints against Plaintiff for **violation of the Harassment Policy**." (Doc. 19-3; emphasis added).

Volley swears in ¶16 of her Affidavit that Harris found Jackson's conduct amounted to a violation of the "harassment policy … and had created a hostile work environment." Harris found Jackson had created a hostile work environment despite the fact that no employee had ever complained about working in a hostile work environment (Doc. 19-3). Neither complainant ever complained that their environment was "hostile," and, in fact, the word "hostile" does not appear in any of their complaints. (Docs. ##19-8, 19-25, 19-26, 19-29).

At ¶37 of her Affidavit, Volley sets out what the Harassment policy states, "[s]uch prohibited harassment **may occur** because of an individual's race, color, sex,

18

age, religion, national origin, disability, veteran's status or other prohibited reason." (Doc. 19-3, emphasis added).

Volley then states, at ¶38 of her Affidavit, "[m]y understanding now, and at all relevant times to this Lawsuit, is that, according to the Harassment Policy, any conduct that has the effect of creating "creating an intimidating, hostile or offensive working environment;" unreasonably interfering with an individual's work performance; or otherwise adversely affecting and individual's employment opportunities" can amount to harassment, ***REGARDLESS*** **of whether the conduct is done because of an individual's race, color, sex, age, religion, national origin, disability, veteran's status or other prohibited reason."** (Doc. 19-3, emphasis added).

**Nowhere** in the policy does it state **"REGARDLESS"** **of whether the conduct is done because of an individual's race, color, sex, age, religion, national origin, disability, veteran's status, or other prohibited reason** (Doc. 19-14).

Even though Jimenez never mentioned that she was fearful of doing her job, Volley testified that she could **"see" fear in Jimenez's written statement.** (Doc. 23-1, p. 39:5-22). Despite other employees entering Jackson's workplace on a daily basis, no other employees other than Jimenez and Williams complained about Jackson spraying Lysol. (Doc. 23-1, p. 32:13-16). Even though Harris and Volley

19

were aware of Jimenez's and Williams' complaints, neither individual went Jackson nor asked her to stop spraying Lysol. (Doc. 23-1, pp. 33:1-17). One would think that if a hostile work environment actually existed at least one employee would have complained about the environment.

Incredibly, Volley states, in her Affidavit at ¶45, that "she found that Plaintiff's justification (her health) for spraying Lysol did not warrant the conduct she displayed." (Doc. 19-3). There is absolutely zero evidence that Volley had any training to support making such an outrageous claim.

Volley also states in ¶46(c) of her Affidavit, Jackson **"did not raise the issue of her underlying health condition** until **she was informed that Harris had found that she had violated the harassment policy ...** (April 12, 2022)." (Doc. 19-3, ¶46(c), emphasis added). This statement is false. Jackson informed Harris of her medical conditions on March 31, 2022. Harris didn't inform Jackson that she had allegedly violated the harassment policy until April 12th.

Both complainants state that the spraying of Lysol had been going on for months, yet they continued to go into the BOC Suite and perform their job duties daily. (Docs. 19-8 and 19-9). Obviously if the environment was so hostile and harassing, they would not have continued to go to the BOC without complaining to HR at an earlier time.

20

In Doc. 19-3 at ¶49, Volley states that she also found Jackson's behavior unacceptable because "Plaintiff's conduct was unprofessional." Volley and Harris both knew Jackson was spraying Lysol for quite some time. If, in fact, it was "unprofessional," why did they allow it to continue over such a long period of time. before the complainants' complaints but never told Jackson to stop spraying the Lysol.

Volley allegedly determined that Jackson could not carry out her administrative assistant job duties or be courteous towards staff members and the public. How could she reach such a conclusion when, based on the record, there were not any complaints from the public or any other employees? (Doc. 19-3, ¶53).

Volley testified, at page 22:1-21 in her deposition, that prior to April 25th, Jackson never told her why she was spraying Lysol, that she had no idea why she was spraying Lysol, and she did not know Jackson had any medical issues. (Doc. 23-1, p. 22:1-21). This statement is false. Volley had already reviewed Jackson's response of March 31st prior to April 25, 2022.

Volley then testified, in her deposition at pages 26:7-27:6, that she did notice Jackson was required to be absent from work a considerable amount of time due to doctor's appointments and medical excuses and her being absent was a regular occurrence. (Doc. 23-1, pp, 26:7-27:6).

21

## V.    Retaliation Claim

Volley testified that Harris made her recommendation for Appellant to receive a written reprimand on April 12th. (Doc. 23-1, p. 70:11-16).

Volley took no action on Harris' recommendation at any time between April 12th and April 22nd, 2022. (Doc. 23-1, p. 70:17-21).

Volley received Jackson's grievance on April 22, 2022. (Doc. 23-1, pp. 70:22-71:1).

Fourteen (14) days after the recommendation from Harris and four (4) days after Jackson's grievance, Volley changed Harris' recommendation from a written reprimand to termination. (Doc. 23-1, pp. 72:15-73:16). Jackson was terminated on April 26, 2022. The only written documentation that Volley received between April 12th and April 26th, 2022, was Jackson's grievance. (Doc. 23-1, pp. 74:10-23).

Volley made her decision to terminate Appellant on April 26th, which was four days after Jackson filed her grievance with Board against Volley, and fourteen days after Harris had given Volley her recommendation that Jackson should only receive a written reprimand. Between the time Harris made her recommendation and Volley made her decision to terminate Jackson, the only documentation Volley received was the two medical excuses from Jackson's physicians that informed Volley that: (1) Excuse one dated April 19th stated, Appellant "had **many** health conditions, one

22

being COPD, that she (Jackson) uses multiple inhalers for, and she needs to take precautions outside her home to protect herself against COVID and other respiratory infections," and (2) Excuse two, dated April 20th stated, "Appellant suffered from Chronic Kidney Disease, **STAGE 4.** Given this diagnosis and her other comorbidities it is **imperative** that she avoid contracting COVID. I have advised her to avoid **any** interaction with **any** person with known covid or **suspected covid** to avoid contracting the virus virus..." (Doc. 19-12, Doc. 19-13) Volley had also received Jackson's grievance. Volley did not receive any evidence that would support terminating Jackson for allegedly creating a hostile work environment and/or harassing employees. Volley terminated an 8-year employee, with pretty much an unblemished work record who had numerous medical issues for discriminatory reason(s). The record is clear that Volley's decision to terminate Jackson was in violation of Appellee's own policies, Jackson's medical records, and the grievance she filed against Volley. Common sense dictates she didn't terminate Jackson for creating a hostile work environment by spraying Lysol.[4]

---

[4] The Court should remember that Volley had already threatened Jackson with severe consequences if she went to the commissioners with a grievance without coming to her first. (Doc. 23-1, pp, 75:9-13, 76:5-11).

23

### C.    Standard or Scope of Review

The court of appeals reviews the granting of a motion for summary judgment *de novo*, using the same legal standard as the district court. *Carter v. Three Springs Residential Treatment,* 132 F.3d 635 (11th Cir. 1998). The basic issue before the court on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing Plaintiff-Appellant's claims for disability discrimination and retaliation under the ADA and Rehabilitation Act. Plaintiff-Appellant established a *prima facie* case of disability discrimination and pretext through both the *McDonnell-Douglas* framework and the convincing mosaic theory of discrimination. Plaintiff-Appellant's evidence, which was either ignored or disregarded by the Court, showed suspicious timing in the decision to change Plaintiff's written discipline recommendation to a termination on after learning

24

about her disability. There are also numerous questions of material fact concerning the timing and extent of the decision makers' knowledge of Plaintiff's disability, questions about whether Plaintiff actually violated the policy, and whether the complaining employees even raised the issue of harassment. Given all of these facts, especially the timing, the District Court's dismissal was erroneous and is due to be reversed.

Likewise, the District Court erred in dismissing Plaintiff-Appellant's retaliation claim. Plaintiff engaged in protected activity on multiple occasions, including writing a letter in response to the allegations against her, meeting with the decision makers to discuss her disability, the disparate treatment she believed she was receiving and to engage in the interactive process, and finally filing a grievance stating that she believed the recommendation of a written discipline to be unfair and harassing. The District Court's findings ignored all of these facts and erroneously ruled that there was no protected activity. This holding dismissing the retaliation claims erroneous and is also due to be reversed.

25

## ARGUMENT

### A. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF'S DISABILITY DISCRIMINATION CLAIM

The District Court erred in dismissing Plaintiff's claim for disability discrimination under the ADA and the Rehabilitation Act of 1973. *See* Doc. 38 pp., 9-16. The Court, by improperly reading the facts and inferences in favor of the Defendant-Appellee, found that Plaintiff did not argue that she had established her *prima facie* case of disability discrimination, but instead proceeded under a convincing mosaic theory of discrimination. Doc. 38 p. 11. It should be noted that Appellee, in filing summary judgment, failed/refused to submit or rely upon the depositions of the two main decisionmakers, Deatrice Harris and Rayetta Volley. Appellee instead chose to submit Affidavits prepared by its counsel which contradicted the decisionmakers' depositions on numerous occasions.

Plaintiff-Appellant's summary judgment opposition makes it clear that she was utilizing both the *McDonnell-Douglas* framework and convincing mosaic theory to oppose Defendant's summary judgment motion, with the analysis of the last element of the *McDonnell-Douglas* framework and the convincing mosaic standard overlapping. Doc. 24-3 pp. 5-6.

26

As Plaintiff-Appellant noted in their summary judgment opposition, to establish a *prima facie* case of disability discrimination under either the ADA or Rehabilitation Act a plaintiff must show that she (1) is disabled; (2) is a qualified individual with a disability; and (3) was subjected to unlawful discrimination because of her disability. *Hilburn v. Murata Electronics, N.Am., Inc.,* 181 F.3d 1220, 1226-27 (11th Cir. 1999).

Defendant-appellee did not contest the first two prongs of the Plaintiff-Appellant's *prima facie* disability claim. The remaining element is whether Plaintiff-Appellant was subjected to unlawful discrimination because of her disability. Plaintiff-Appellant also maintains that she can establish a convincing mosaic of discrimination which would allow a jury to infer intentional discrimination. Essentially, the last element of the *McDonnell Douglas prima facie* case and the convincing mosaic standard can be proved through the same evidence and using the same analysis.

For a plaintiff in a discrimination case, including a disability case, the Eleventh Circuit has held that the *McDonnell Douglas* framework "is not, and never was intended to be the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Flowers v. Troup Cty. Ga. School Dist.,* 803 F.3d 1327,1336 (11th Cir. 2015)(quoting *Smith v. Lockheed-Martin Corp,*

27

644 F.3d 1321, 1328 (11th Cir. 2011)".  Indeed, "a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.*; *See e.g., Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017);*Lockheed-Martin Corp.* at 1328. This also applies in pregnancy cases.  *See Hamilton v. Southland Christian School, Inc.,* 680 F.3d 1316, 1320 (11th Cir. 2012) (citing *Lockheed-Martin* at 1328).

This Court has held that a "convincing mosaic" may be shown by "(1) suspicious timing, ambiguous statements..., and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of similarly situated employees, and (3) evidence that the employer's justification is pretextual." *Lewis* at 1018 (citing *Silverman v. Bd. of Educ., of City of Chicago*, 637 F.3d 729, 733-34 (7th Cir. 2011).  If the plaintiff presents circumstantial evidence sufficient to raise "reasonable inference that the employer discriminated [retaliated] against the plaintiff, summary judgment is improper." *Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1256 (11th Cir. 2012)(quoting *Lockheed-Martin Corp.,* 644 F.3d at 1328).

The District Court erred in its analysis under both the *McDonnell Douglas* framework and the convincing mosaic theory.  The Court found that "there is no

28

suspicious timing that would support a claim of discrimination," and "[c]onsidering the totality of the circumstances, the timing of Jackson's termination, 'is anything but suspicious.'" Doc. 38 pp. 12-13. The District Court's findings in this regard are contrary to the facts and the timeline of events that they laid out in support of the dismissal of Plaintiff-Appellant's claims and go against the long-standing summary judgment standard where all facts and inferences are read in a light most favorable to the non-moving party, not the moving party. The District Court's opinion ignores this admonition and construes all facts and inferences in favor of the Appellee. Accordingly, the District Court's Opinion and final judgment in favor of the Appellee is due to be reversed.

### 1. The Timeline Used by the District Court Supports Plaintiff-Appellant's Convincing Mosaic Theory

The District Court adopted a timeline of events in this case that assumed that Defendant's decisionmakers were not aware of Plaintiff-Appellant's disability prior to investigating her for spraying Lysol in her office. Doc. 38pp. 5, 12. While, as noted below, Plaintiff disputes this finding and asserts that Defendant did have knowledge of her disability prior to the investigation, the version laid out by Defendant still supports a finding of disability discrimination based on the suspicious timing of the rejection of the recommendation to give Plaintiff-Appellant

29

a write-up, and instead, to reject that recommendation and terminate her almost immediately after having a meeting where Plaintiff detailed her disability and discussed accommodations with the decision makers.

The District Court found that Jimenez first made her written complaint about Jackson to Harris on March 11, 2022. Doc. 38 p. 2. The Court then found that Harris met with Jimenez and Williams about the complaint on March 14, 2022. Doc. 38 p. 3. Harris also received written statements from the two employees and further information via email. *Id.* at 3-4.

While Harris' investigation into these complaints was being conducted, Jackson went out on FMLA leave from March 15, 2022, to March 27, 2022. Doc. 38 p. 4. When she returned from leave on March 28th, Jackson met with Harris to discuss the complaint. *Id.* During this meeting, Jackson told Harris that the two complaining employees did not like her because of issues related to a former co-worker. *Id.* Harris asked Jackson to submit a written response, which she did on March 31, 2022. *Id.* In the response Jackson denied harassing the two employees and explained that she sprayed the Lysol for safety reasons related to her underlying health conditions. *Id.* Jackson denied spraying Jimenez and Williams directly but stated that she sprayed the Board Suite whenever anyone entered without a mask. *Id.*

30

The District Court then found that on April 12, 2022, Harris wrote a letter to Plaintiff-Appellant Jackson, which summarized her findings. *Id.* Harris determined that Plaintiff's conduct violated the County's harassment policy. *Id.* Harris then determined that there was no medical documentation on file supporting Jackson's need to spray disinfectant. Doc. 38 p. 5. Harris then recommended that Jackson receive a written reprimand for her actions. Doc. 38 p. 5.

As the District Court noted, Harris presented her findings to Volley, who had the authority to make the final determination regarding disciplinary actions. *Id.* A few days after Volley received Harris' April 12th letter and accompanying materials, Volley, Harris and Jackson all met together to discuss the Jimenez and Williams' complaint. *Id.* During this meeting Jackson informed both Harris and Volley that she had only sprayed the disinfectant when someone entered the Board Suite without a mask because she suffered from severe underlying health conditions, specifically including COPD and chronic kidney disease. *Id.* Volley requested that Jackson provide medical documentation regarding her health conditions and asked if Jackson required any accommodations for her disability. *Id.*

When asked to engage in the interactive process by Volley, Jackson took advantage of the opportunity and requested that a chair be moved from her desk so unmasked people could not sit near the desk. *Id.* On April 19, 2022, Jackson

provided Volley with a letter from Dr. McClendon stating that he was treating Jackson for COPD and explaining that because of her COPD and other health issues, she needed to take extra precautions outside the home to protect her health. Doc. 38 p. 6. Jackson provided another doctor's letter on April 20, 2022, from Dr. Smith, who was her kidney doctor, stating that she was being treated for stage 4 Chronic Kidney Disease and stating that she had recommended that Jackson avoid anyone with COVID or suspected to have COVID. *Id.*

Then, after these conversations and having provided medical documentation to support her disability, Jackson filed a grievance to the Board about Harris' investigation and recommendation. *Id.* In this grievance, she followed up her conversations with Harris and Volley and discussed the investigation into her actions and stated that she only sprayed Lysol as a safety precaution because she had "several underlined medical health issues." *Id.*

On April 25, 2022, Harris, Volley and Jackson met to discuss the grievance before it could be sent to the Board. *Id.* Jackson explained that she was appealing Harris' April12th letter. *Id.* Volley told Jackson that Harris' April 12th letter was merely a recommendation and that she (Volley) would make the final determination about Jackson's employment. *Id.*

32

After meeting with Jackson and learning about her disabilities and engaging in the interactive process with her, Volley decided to reject Harris' recommendation and terminated Plaintiff. Doc. 38 p. 7. Volley testified in her declaration that Plaintiff was informed during the Initial Meeting that it was found that she had violated the harassment policy, and that the recommendation was that she receive a written reprimand. Doc. 19-3 p.6 ¶26. Volley then states that during this same Initial Meeting she requested that Plaintiff provide her with documentation regarding her underlying health conditions for her to consider when making her determination as to whether to discipline Plaintiff regarding the allegations against her. Doc. 19-3 p. 6 ¶27. Plaintiff agreed to provide the documentation and did in fact provide that documentation to Volley prior to her termination. Doc. 19-3 pp. 6-7 ¶¶27, 32 & 33. Volley admits that she delayed making the decision to terminate Plaintiff until she had received the medical documentation. Doc. 19-3 p. 7 ¶34. After Jackson was informed of her dismissal, she provided Volley and Jackson with a resignation letter, which they rejected and told her that she was dismissed. *Id.*

This timeline of events shows that the District Court erred when it held that "[h]ere, there is no suspicious timing that would support a claim of discrimination." Doc. 38 p. 12. That finding is not true and is not supported by the factual findings made by the District Court. Even if Defendant's assertion that it had no knowledge

33

of Plaintiff-Appellant's medical conditions or disabilities prior to the employee complaints and Harris' recommendation is believed, both Volley and Harris had actual knowledge of Plaintiff-Appellant's medical conditions after they met with her to discuss Harris' recommended discipline, prior to her termination.

Prior to learning of Plaintiff-Appellant's disability, Harris' recommendation was that Jackson receive a written warning for her alleged violation of the harassment policy. However, after gathering no new information other that the information about Plaintiff's medical conditions and her disability accommodation request, Volley rejected Harris' recommendation and terminated Jackson. The fact that the written warning recommendation was rejected **after** learning about Jackson's disability is exactly the kind of "suspicious timing" that can be used to support the convincing mosaic theory and/or to prove that Plaintiff-Appellant was terminated because of her disability.

The District Court and Defendant argued that since Plaintiff-Appellant was found to have engaged in misconduct close in time to her termination, then there can be no suspicious timing with her termination. However, in this particular case, the timeline laid out above becomes particularly important at this time. What makes this case different from others is that it was initially recommended that Plaintiff-Appellant be given a written warning for her actions. It was only after Volley met

34

with the Plaintiff-Appellant and learned about her disabling medical conditions that she decided to reject the written warning recommendation from Human Resources and to take the most drastic action against Plaintiff-Appellant - termination. This timeline shows that suspicious timing does exist in this case to support the convincing mosaic of discrimination.

2. **There Was Abundant Evidence That the Decision-Makers Had Knowledge of Plaintiff-Appellant's Disability and the District Court's Contrary Finding is Erroneous**

Contrary to the Appellee's assertions District Court's findings, Plaintiff-Appellant had put Defendant on notice of her serious medical conditions much earlier in her employment with the County. Beginning in 2015, Jackson began missing work due to her medical conditions and having to be in and out of hospitals as a result. Doc. 24-2 pp. 3-4 #6. It was undisputed that Jackson suffered from COPD and Chronic Kidney Failure, Stage 4. Doc. 24-2 p.3 #3. She informed her supervisor at that time, Janis Jarvis, that she suffered from these severe medical issues. Doc. 24-2 p.3 #5. Then on June 23, 2017, Jackson was written up and placed on a Performance Improvement Plan (PIP) by her supervisor Bill Twomey for absenteeism. Doc. 24-2 pp. 4-5 #12. As a result of receiving this write-up, Jackson informed Twomey about her medical issues. Doc. 24-2 p. 5 #13. In fact, the write up noted that the county "acknolwedge[d] the receipt of various medical excuses that

35

have been submitted......"). Doc. 24-2 p. 5 #15. Thus, Jackson's personnel file contained a record of her disability.

Around September 2021, Janice Jarvis ceased to be Plaintiff's supervisor and Rayetta Volley became Jackson's supervisor. Doc. 24-2 p. 5 #18. Once Volley became her supervisor, Jackson explained to Volley about her medical issues and why she was absent from work Doc. 24-2 pp. 5-6 #19.

Closer to her termination, Jackson was out on FMLA leave from March 15, 2022, through March 27, 2022. Doc. 24-2 p. 6 # 25. Jackson informed HR Director Deatrice Harris about her need for FMLA. Doc. 24-2 pp. 6-7 ##25-28. Harris testified that she was the "gatekeeper" as far as employee FMLA leave requests were concerned and she applied for Jackson to have her FMLA extended on March 16, 2022. Doc. 24-2 pp. 6-7 ##26 & 28. Jackson's FMLA paperwork indicated that she was seeking leave for her "own serious health condition." Doc. 24-2 p. 17 #84. Most importantly, when the complaint was made against her for spraying Lysol, Jackson informed Harris and the County about her underlying serious health issue in the March 31, 2022, letter she provided in response to the complaint Doc. 24-2 p. 12 #65 ("I...have an underlined medical health issue..."). Defendant had notice of all of this prior to the April 12, 2022, meeting with Jackson and Volley where Harris

36

outlined the investigation and told Jackson and Volley that she was recommending a written discipline.

Harris, in her declaration submitted in lieu of her actual sworn deposition testimony, admits that as of a few days after April 12, 2022, she and Volley met with Jackson who they claim told them at that point about her underlying health conditions of COPD and chronic kidney disease which made her more vulnerable to COVID. Doc. 24-2 p. 17 ## 83-84. Volley also admits to meeting with Jackson and learning about her disabilities prior to making the termination decision. Doc. 19-3 pp. 5-6 ¶¶22-24.

Prior to the conclusion of Harris' investigation and Volley's decision to reject Harris' recommendations and terminate Jackson, Jackson provided Defendant with 2 medical excuses from her physicians. Doc. 24-2 pp. 21-22 #106. One of these was dated April 19, 2022, and stated that Jackson had many health conditions, including COPD, that Jackson used multiple inhalers for these conditions and that she needed to take precautions outside her home to protect herself against COVID and other respiratory infections Doc. 24-2 pp. 21-22 #106. The second letters was dated April 20, 2022, and detailed that Jackson suffered from Chronic Kidney Disease, Stage 4; and that given this diagnosis it was imperative that she avoid

37

contracting COVID. Doc. 24-2 pp. 21-22 #106. These were all provided before the decision to terminate in lieu of a written reprimand were made.

Harris' letter to Volley detailing the results of her investigation stated that the investigation was completed on April 25, 2022, even though Volley and Jackson had known about Harris' disciplinary recommendation for almost two weeks at that time. Volley testified she received the letter with the investigation results and recommendation from Harris on April 25, 2022. She then had another meeting with Jackson on April 25th to discuss a grievance Jackson had filed on April 22nd.

Then on April 26, 2022, Volley made the decision to reject Harris recommendation regarding Jackson's discipline and to terminate Jackson instead of issuing her a written warning. Doc. 19-3 p. 13 ¶¶60-61. Therefore, it is undisputed that the decision to reject the HR Director's recommendation of a written warning and to terminate Jackson's employment was made **after** Volley had learned of Jackson's disabilities. Additionally, it does not matter that the investigation started before Harris and Volley disgustedly claim to have known about Jackson's disabilities since the original recommendation from Harris was only a written warning, but the final decision to disregard that recommendation and terminate was undisputedly made after Volley had learned of Jackson's disabilities. Defendant's

38

arguments in their brief cannot controvert this fact that is detailed in Volley's own declaration submitted by Defendant in lieu of her deposition given in this case.

There are questions of material fact about when and what Defendant's decision makers learned about Jackson's serious medical conditions. Did they know before the complaint against her based on her FMLA paperwork, conversations with management and co-employees, and prior disciplines, or did the learn after the complaint when they had their initial sit-down discussion with her. Given the importance of these facts and the questions surrounding them, a jury should resolve these issues instead of the District Court.

### 3.    Plaintiff-Appellant Presented Other Evidence Showing That She Was Terminated Because of Her Disability.

The whole issue surrounding Plaintiff's termination is related to her disability and her efforts to accommodate her disability. Plaintiff was terminated because she allegedly created a hostile work environment for two co-workers by spraying Lysol in the office after they passed through. Plaintiff testified that she did this because she suffers from multiple disabling conditions, namely COPD, chronic kidney disease, stage 4 and Congestive Heart Failure. Plaintiff's serious disabling medical conditions caused her to require extra precautions outside of her home to protect against COVID and other respiratory infections. Doc. 19-12 EX K. Plaintiff also

39

testified, and Defendant's witnesses acknowledge that she informed Defendants about her medical conditions and even requested accommodations. She also told them that the spraying of Lysol was related to her disabilities and the prevention of COVID, to which she was highly susceptible. Volley even states in her declaration that she considered and rejected Plaintiff's justification for spraying the Lysol, which was her disabling medical conditions. Doc. 24-2 p. 21 #103. Therefore, the entire basis for her termination involves actions of reasonable accommodations and self-accommodations that Plaintiff took to allow her to be able to work with her disabling conditions.

Additionally, there is undisputed evidence that **EVERYONE** in the office sprayed Lysol in their work areas to help prevent the passing around of COVID. Doc. 22-1, pp. 49:12-23. Volley was aware of and testified that she knew that everyone in the office was spraying Lysol to combat COVID at the same time Plaintiff was spraying Lysol. Despite this knowledge, Plaintiff was never asked or told to stop spraying Lysol when employees entered her space, and it was never a problem until the complaint was made in March 2022. Defendant could have simply asked or instructed Plaintiff to stop or change how she sprayed the Lysol. Certainly, termination for this reason, when everyone else was doing something very similar is unreasonable and evidence of pretext.

40

It is questionable whether Plaintiff's actions actually violated the harassment policy. There is no allegation or evidence that any of Plaintiff's conduct was based on someone else's race, color, sex, age, religion, national origin, disability, veteran's status or any other prohibited reason. The individuals who complained about Plaintiff's conduct never stated that they felt harassed or threatened by Plaintiff. Doc. 24-2 pp. 11, 14 ##49-51, 70-71. Moreover, **everyone** in the office was spraying Lysol in the office all of the time and no one put a stop to it. Also, no one ever told Plaintiff that her spraying of Lysol was offensive or harassing or asked her to stop.[5] The fact that this was such a common and open practice in the office which was never addressed or corrected shows that the allegations of "harassment" were not that severe, were not a violation of the harassment policy and certainly did not warrant a termination without warning and a chance for correction.

There is other evidence of pretext which supports a reversal of the District Court's decision. Defendant's disciplinary policy provides that "[d]ischarges for disciplinary reasons shall occur only after the Supervisor or Department Head have counseled the employee, explained how the employee needs to improve, and stipulated a time or times for further evaluation. Failure of the employee to improve as required may result in discharge." Doc. 24-2 p. 12 # 59. Harris testified that this

---

[5]Jackson testified that she sprayed the Lysol whenever an unmasked person came into the office, not just when Jimenez or Williams entered the area.

41

was the normal process in place to be followed when disciplining and employee. Doc. 24-2 p. 12 # 60. Plaintiff did not have a disciplinary history or a pattern of misconduct. Harris recommended following these procedures, however, after admittedly learning about Plaintiff's disabilities Volley decided to disregard the normal procedures in favor of termination. When taken together, this evidence creates a question of fact as to whether Plaintiff was terminated because of her disability. The decision makers knew about her disabilities. They had discussions with her about her medical conditions and possible accommodations. The reason for her termination, her efforts to protect herself against Covid because of her health problems, was related to her disabilities. Everyone else in the office was spraying Lysol everywhere, but it was only the Plaintiff who was terminated. They questionable belief that Plaintiff's actions violated the harassment policy. Finally, the way Volley chose to disregard Harris' recommendation and bypass the progressive discipline policy in favor of termination also shows the pretextual nature of the termination.

When all of these facts are viewed in a light most favorable to the non-moving party, a reasonable jury could determine that Plaintiff-Appellant established that she was terminated because of her disability under either the *McDonnell-Douglas* framework or convincing mosaic theory of discrimination. There is suspicious timing for the adverse action, which was changed from a written warning to a

42

termination immediately after a meeting where the decision makers and Plaintiff discussed her specific, serious medical condition and accommodations for that condition.

There is also questions about when the decision makers first learned about the serious medical condition that support the finding of disability discrimination. Moreover, the evidence also shows that "everyone" was spraying Lysol and taking precautions for COVID and that Plaintiff-Appellants actions did not violate the harassment policy maintained by the County. All of these facts support the finding of disability discrimination and merit a reversal of the District Court's opinion and judgment.

### 4.　There is Evidence of Pretext

Plaintiff-Appellant can point to several points to show why the defendant's articulated reason is a pretext for age discrimination. An employment discrimination plaintiff can demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons ...that a reasonable factfinder could find them unworthy of credence...The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp. 1273, 1281 (M.D. Ala. 2000) (citations omitted). The plaintiff is allowed to produce evidence "sufficient to permit a reasonable fact finder to

43

conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). A plaintiff attempting to show pretext under the *McDonnell-Douglas/Burdine* framework must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs, supra* at 1538 (quoting *Sheridan v. DuPont*, 100 F.3d 1061, 1072 (3d Cir. 1996). A plaintiff may show pretext using comparative evidence, statistical evidence or direct evidence of discrimination. *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir. 1985). Once the plaintiff has met this burden the Court "may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer." *Sheridan, supra* at 1072. The present Plaintiff-Appellant can point to several pieces of evidence from which a reasonable factfinder could infer a discriminatory motive from the defendant's actions.

The same evidence supporting Plaintiff-Appellant's claim that she was terminated because of her disability or establishing her convincing mosaic of disability discrimination evidence supports a finding of pretext. The fact that Jackson was first recommended to receive a written warning, which was changed to a termination after the decision makers were specifically told about her disabling

medical conditions is evidence that the harassment complaint **was not the real reason for her termination.**

The District Court seemed to find that because Plaintiff was being investigated prior to her conversation with Volley and Harris about her disability and accommodations that her telling them about her medical conditions could not have prompted her termination. What is important is that prior to discussing her disability with Volley and Harris, Plaintiff was heading towards a written warning recommended by Harris. It was not changed to a termination until after this conversation and after her physicians provided documentation supporting her disability. Therefore, a jury could determine that the harassment complaint was not the "real reason" for her "termination," but instead it was her disability that caused her to be terminated instead of receiving a written warning.

The questions concerning the timing of Defendant's knowledge of Plaintiff's disability also support a finding of pretext, as does the fact that everyone was spraying Lysol at this time and the fact that there was no evidence that Plaintiff-Appellant violated the harassment policy that covered harassment based on race, sex, and other protected characteristics. There was no evidence that Jackson harassed anyone because of any protected characteristic. Given these facts and the erroneous analysis by the District Court where it read all facts and inferences in a light most favorable to the Defendant-Appellee, the Opinion and Judgment entered by the

45

District Court is due to be reversed and the case remanded back to the District Court for trial.

**B.    The District Court Erred in Dismissing Plaintiff-Appellant's Retaliation Claim**

The District Court also erred in dismissing Plaintiff-Appellant's claim for retaliatory termination under the Rehabilitation Act and ADA. *See* Doc. 38 pp. 16-21. The District Court correctly found that Plaintiff-Appellant had suffered an adverse employment action. Doc. 38 p. 17. The District Court also found that "given the timing between the alleged protected activity and her firing, Plaintiff-Appellant would be able to establish causation if she establishes that Jackson did in fact engage in statutorily protected activity." Doc. 38 p. 17. However, after making these correct findings, the Court erroneously held that Plaintiff-Appellant did not engage in an activity protected under the ADA and/or the Rehabilitation Act and therefore, could not maintain her retaliation claim. *Id.* at 16-21.

**1.    Plaintiff-Appellant's Grievance Was Protected Activity**

The District Court erred in determining that Plaintiff-Appellant's grievance that she filed over the recommendation to discipline her was not protected activity under the ADA or the Rehabilitation Act. The District Court declined to look at any of Plaintiff-Appellant's other evidence of protected activity because it said that Plaintiff-Appellant's Amended Complaint limited the protected activity that could be considered to just the grievance. Doc. 38 pp. 17-18.

46

Plaintiff-Appellant's grievance was submitted to the County on April 22, 2022. The grievance was submitted following a meeting between Jackson, Harris and Volley, where Jackson was informed that she was being recommended to receive a written discipline for her alleged violation of the harassment policy. During this meeting, Jackson described her medical conditions, COPD and kidney disease, and stated that she only sprayed the Lysol as a safety precaution for these serious medical conditions. Also, during this meeting, Plaintiff-Appellant discussed potential accommodations for her disability, including the moving of a chair from near her desk to limit her exposure.

A few days after this meeting and after having learned about the recommendation for a written warning, Jackson filed her grievance with the County. Jackson's grievance was titled "Grievance Letter to the Board of Commissioners regarding discrimination on the grounds of hostile work environment and treatment between workers concerning COVID." Doc. 19-14. In this grievance, Jackson stated that she had "several underlined medical health issues and [was] not attempting to harass anyone," instead she was just "practicing safety precautions" to protect her health. Doc. 19-14. Jackson also referenced the County job posting which referenced masking, stating "[d]ue to health and safety concerns, we require everyone entering the Human Resources Office to wear a mask......".

47

Jackson's grievance qualifies as protected activity, especially given the context in which it was received. Jackson filed her grievance after she learned that it was going to be recommended that she receive a written discipline for spraying Lysol in her work area to protect her health from her very serious medical conditions and COVID. The grievance was a continuation of the conversation she had previously had with Volley and Harris where she explained her COPD, among other things, and requested an accommodation as part of the interactive process under the ADA. Given the link between her conversation and her grievance, a jury could determine that Jackson engaged in protected activity.

Jackson's grievance also serves as protected activity standing along, without its connection to the prior conversation and accommodation request. In the grievance, Jackson clearly asserts that she is filing the grievance because her rights to protect her health under the ADA were being attacked. She gave the grievance the following subject line: "Grievance Letter to the Board of Commissioners regarding discrimination on the grounds of hostile work environment and treatment between workers concerning COVID protocols.". She then stated that she had "several underlined medical health issues and I am not attempting to harass anyone I am just "practicing safety precautions" in protecting my health."

Jackson's grievance was handled by Volley and Harris who knew the extent of her medical health issues and what her complaints were. Jackson reasonably

48

believed that she was being harassed and discriminated against because she was being treated less favorably because of her disability and her efforts to accommodate that disability and stay safe. She filed the grievance to address those concerns under the ADA and Rehabilitation Act. A reasonable jury could determine that Jackson did engaged in protected activity under the ADA and Rehabilitation Act. Based on these facts, the District Court's dismissal of these claims is erroneous and due to be reversed.

> **2.    Plaintiff-Appellant Engaged in Other Protected Activity Including Her Meeting With Volley and Harris When She Disclosed Her Disability and Engaged in the Interactive Process**

The District Court erred in ignoring Jackson's protected activity other than the April 22nd grievance. The reasoning given by the court was that Plaintiff's Amended Complaint only referenced the grievance letter as the protected activity instead of any other letter or verbal report. However, this reasoning and resulting finding were in error. Plaintiff's Amended Complaint discusses her other protected activity, along with the grievance. *See* Doc. 9 pp. 3-4. The grievance and these other complaints and accommodation request are all intertwined and part of a global effort to pursue Jackson's rights under the disability laws. Defendant was certainly aware of Plaintiff's disability discrimination complaints and the fact that they had engaged in the interactive process with Plaintiff immediately prior to her termination. Limiting the protected activity to just the April 22nd grievance is a matter of form over

49

substance and completely ignores the actual facts of the case. The District Court erred when it did just that.

Plaintiff-Appellant engaged in protected activity several times during her employment with Defendant other than just the April 22nd grievance letter. First, she raised the issue of her underlying health issues in her March 31, 2022, letter to Deatrice Harris. Doc. 19-32. When she wrote this letter Plaintiff had just came back from Family Medical Leave for her own serious condition which had been approved by Harris.

According to Volley, Plaintiff engaged in protected activity during their "Initial Meeting" which took place a few days after April 12th. Doc. 19-3 p. 5 ¶22. Volley admits that Plaintiff told her that she sprayed the Lysol in her office when Jimenez and Williams entered without wearing a mask, just like she sprayed the Lysol when everyone came through without a mask. *Id.* Volley then testified that Plaintiff told her that she sprayed the Lysol because she had underlying health conditions, including COPD and chronic kidney disease, which made her more vulnerable to COVID-19. *Id.* According to Volley, this Initial Meeting was the first time she was made aware of Plaintiff's serious health conditions which made her more vulnerable to COVID-19. Doc. 19-3 p. 6 ¶23.

Volley testified in her declaration that Plaintiff was informed during the Initial Meeting that it was found that she had violated the harassment policy, and that the

50

recommendation was that she receive a written reprimand. Doc. 19-3 p.6 ¶26. Volley then states that during this same Initial Meeting she requested that Plaintiff provide her with documentation regarding her underlying health conditions for her to consider when making her determination as to whether to discipline Plaintiff regarding the allegations against her. Doc. 19-3 p. 6 ¶27. Plaintiff agreed to provide the documentation and did in fact provide that documentation to Volley prior to her termination. Doc. 19-3 pp. 6-7 ¶¶27, 32 & 33. Volley admits that she delayed making the decision to terminate Plaintiff until she had received the medical documentation. Doc. 19-3 p. 7 ¶34.

Importantly, Volley admits that she engaged in the interactive process with Plaintiff, and they discussed accommodations for Plaintiff's health conditions. Doc. 19-3 p. 6 ¶28. Plaintiff even requested an accommodation that a chair in the office near her desk where visitors regularly sat be moved away from her to protect against visitors who did not wear a mask. Doc. 19-3 pp. 6-7 ¶28; Doc. 19-43 p. 90. Requesting an accommodation and engaging in the interactive process is considered a protected activity under the Rehabilitation Act and ADA. *Belgrave v. Publix Market*, 2023 U.S. App. LEXIS 11889, *9 (11th Cir. May 16, 2023); *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). Therefore, given Plaintiff's internal complaints, request for accommodation and engagement in the interactive process it

51

is clear that she engaged in a protected activity under the Rehabilitation Act and the ADA.

These *prima facie* case facts, along with the pretext argument above also support a finding of pretext as to the retaliation claim. The timing of the change in discipline, the questions concerning the decision maker's knowledge, and the questions concerning Plaintiff's violation of the policy, among other things, make this case appropriate for jury determination. Because the District Court already found that Plaintiff-Appellant had been subjected to an adverse action and established her causal connection, the grant of summary judgment on this claim is due to be reversed and the case sent back to the District Court for a jury trial.

## CONCLUSION

Based on the above statement of facts and argument, the decision of the District Court granting summary judgment and dismissing Plaintiff-Appellant's claims for disability discrimination and retaliation under the ADA and Rehabilitation Act are due to be REVERSED and the case REMANDED back to the District Court for further proceedings, including a jury trial.

Respectfully submitted,


*/s/ **Gregory O. Wiggins***
Gregory O. Wiggins
Wiggins Childs Pantazis Fisher & Goldfarb, LLC.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
gwiggins@wigginschilds.com
*Counsel for Plaintiff-Appellant*


## CERTIFICATE OF COMPLIANCE


Counsel for the Appellant certifies that the Brief for Plaintiff-Appellant complies with the type-volume limitation as it contains 11,129 words according to the word-count function of the word-processing system used to prepare the brief.

## CERTIFICATE OF SERVICE

I hereby certify that there are no known non-CM/ECF participants for mailing by United States Postal Service, and that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system on this 4th day of November 2025, which will send notification of such filing to the following:

Raleigh W. Rollins
H. Thomas Shaw
Alexander & Vann, LLP
411 Gordon Avenue
Thomasville, GA 31792

/s/ *Gregory O. Wiggins*
OF COUNSEL