UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

Docket No. 25-11488-J

---

WILLIAM JACKSON, as Executor of the Estate of RHONDA JACKSON,
Plaintiff-Appellant,

v.

SUMTER COUNTY, GEORGIA,
Defendant-Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

---

BRIEF OF APPELLEE SUMTER COUNTY, GEORGIA

---

Raleigh W. Rollins, Jr., Esq.
Georgia State Bar No. 613860
H. Thomas Shaw, Esq.
Georgia State Bar No. 593166
Alexander & Vann, LLP
411 Gordon Avenue
Thomasville, Georgia 31799-1479
(229) 226-2565
*Attorneys for Appellee Sumter County*

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Docket No. 25-11488-J

WILLIAM JACKSON, as Executor for the
Estate of RHONDA JACKSON,
Plaintiff-Appellant,

v.

SUMTER COUNTY, GEORGIA,
Defendant-Appellee.

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 and 26.1-2(a), the undersigned counsel for Appellee Sumter County, Georgia, hereby show that the following parties or persons may have an interest in the outcome of this case on appeal:

Alexander & Vann, LLP;

Association of County Commissioners of Georgia–Interlocal Risk Management Agency;

Sumter County, Georgia;

Sumter County Board of Commissioners;

Volley, Rayetta;

i

Harris, Deatrice;

Jackson, William, individually and as the Executor of the Estate of Rhonda Jackson;

Estate of Rhonda Jackson;

Wiggins Childs Pantazis Fisher & Goldfarb, LLC;

Wiggins, Gregory O.;

Rollins, Jr., Raleigh W.;

Shaw, H. Thomas;

Gardner, Leslie, Judge, United States District Court, Middle District of Georgia.

In addition, pursuant to Eleventh Circuit Rule 26.1-3, undersigned counsel hereby certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

**APPELLEE'S STATEMENT REGARDING ORAL ARGUMENT**

Appellee Sumter County, Georgia ("Sumter Coutny") respectfully submit that oral argument is not necessary in this appeal.  The law governing the issue on appeal is clear and unequivocal.  The facts, positions, and legal arguments of the parties are adequately set forth in the record and briefs, and Appellees do not believe the disposition of the appeal will be advanced by oral argument.

iii

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT......................................................i-ii

STATEMENT REGARDING ORAL ARGUMENT...............................................iii

TABLE OF CITATIONS...................................................................................v-viii

STATEMENT OF JURISDICTION......................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE STANDARD OF REVIEW................................................3

STATEMENT OF THE CASE.........................................................................4-19

SUMMARY OF ARGUMENT............................................................................20

ARGUMENT AND CITATION OF AUTHORITY..........................................22-44

I.     Plaintiff cannot establish a prima facie case of discrimination....................25

II.    Plaintiff cannot establish a prima facie case of
       retaliation pursuant to the ADA and/or the RA.............................................29

III.   Jackson's violation of the Harassment Policy
       is a legitimate non-discriminatory reason for her dismissal.........................34

IV.    Plaintiff cannot show that Sumter County's stated reason
       for Jackson's dismissal was pretext for discrimination
       and/or retaliation.......................................................................................36

       1. Volley had a reasonable basis to believe
          that Jackson violated the Harassment Policy
          and that dismissal was appropriate........................................................37

2.  The timing of Jackson's dismissal does not show pretext........................42

CONCLUSION..................................................................................................44

CERTIFICATE OF COMPLAINCE.....................................................................45

CERTIFICATE OF SERVICE.............................................................................46

## TABLE OF CITATIONS

<u>Cases</u>                                                                                      <u>Page</u>

*Akridge v. Alfa Ins. Cos*., 93 F.4th 1181, 1198 (11th Cir. 2024)............................27

*Albra v. Cit of Fort Lauderdale*,
    232 Fed. Appx. 885, 891 (11th Cir. 2007)....................................................29

*Alvarez v. Royal Atl. Developers, Inc.*,
    610 F.3d 1253, 1258 (11th Cir. 2010)..................................35, 37, 38, 41, 43

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248 (1986)...........................22

*Atchison v. Bd. of Regents of the Univ. Sys. of Ga.*,
    802 Fed. Appx. 495, 502-03 (11th Cir. 2020)...............................................22

*Bargoot v. Sch. Bd. of Palm Beach Cnty.*,
    2022 WL 293313, at *6 (S.D. Fla. Feb. 1, 2022).........................................32

*Batson v. Salvation Army*,
    897 F.3d 1320, 1328-29 (11th Cir. 2018).....................................................23

*Chapman v. AI Transport*,
    229 F.3d 1012, 1024 (11th  Cir. 2000)......................................34, 36, 38, 41

*Clark v. Huntsville City Bd. of Educ.*,
    717 F.2d 525, 529 (11th Cir. 1983)..............................................................23

*Combs v. Plantation Patterns*,
    106 F.3d 1519, 1527–28 (11th Cir. 1997)...............................................23, 24

*Cribbs v. NFI Network Log. Sols., LLC*, 2014
    WL 4805328, at *4 (S.D. Ga. Sept. 26, 2014).............................................23

*Davidson v. Chspsc LLC*,
    861 Fed. Appx. 306, 311 (11th Cir. 2021)....................................................37

*Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000)....................................23

*E.E.O.C. v. Total Sys. Servs., Inc.*,
    221 F.3d 1171, 1176-77 (11th Cir. 2000)....................................................37

*Gary v. City of Warner Robins, Georgia*,
    2018 WL 3825220, at *12 (M.D. Ga. Aug. 10, 2018)................................31

*Gilmour v. Gates, et. al.*, 382 F.3d 1312, 1315 (11th Cir. 2004)...........................33

*Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–81 (11th Cir. 1989)...........................23

*Higdon v. Jackson*, 393 F.3d 1211, 1218 (11th Cir. 2004)...................................30

*Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997)................................23

*Holly v. Clairson Indus., L.L.C.*,
    492 F.3d 1247, 1254–55 (11th Cir. 2007)................................................25

*Jackson v. State of Ala. State Tenure Comm'n*,
    405 F.3d 1276, 1289 (11th Cir.2005)........................................................36

*Jean-Francois v. Anderson*,
    2008 WL 5272864, *7 (M.D. Ga. 2017).....................................................24

*Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019)..................23, 36

*Lightfoot v. Henry Cnty. Sch. Dist.*,
    771 F.3d 764, 779 (11th Cir. 2014)............................................................33

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 586–587 (1986)..................................................................22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)........................20, 23, 24

*Owen v. I. C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011)................................2

*Perryman v. Johnson Prods., Co.*,
    698 F.2d 1138, 1142 (11th Cir.1983)..........................................................34

*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002).......................................38

*Satchel v. Sch. Bd. of Hillsborough Cnty.*,
    2007 WL 3023948, at *2 (M.D. Fla. Aug. 25, 2006)..................................31

*Scott v. Harris*, 550 U.S. 372, 380 (2007)...........................................................22

*Silberman v. Miami Dade Transit*,
    927 F.3d 1123, 1133–34 (11th Cir. 2019)................................................25

*Smith v. Library Board of Homewood*,

2018 WL 2011026, at \*4 (N.D. Ala. Apr. 30, 2018)....................................23

*Smith v. Papp Clinic, P.A.*,
   808 F.2d 1449, 1452-53 (11th Cir. 1987)....................................................35

*Starkey v. Colquitt Cnty. Bd. of Comm'rs*,
   2014 WL 6679117, at \*5 (M.D. Ga. Nov. 25, 2014)..................................24

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
   117 F.3d 1278, 1287 (11th Cir. 1997)...................................................29, 34

*Tex. Dep't of Cmty. Affairs v. Burdine*,
   450 U.S. 248, 253 (1981)...............................................................20 24, 34

*Thompson v. Tyson Foods, Inc.*,
   939 F. Supp. 2d 1356, 1369 (M.D. Ga. 2013)...........................................36

*Walls v. Lowe's Home Centers, LLC*,
   789 Fed. Appx. 852, 855 (11th Cir. 2019)..................................................38

## STATUTES

11th Cir. R. 31-3..........................................................................................46

28 U.S.C. § 1291..............................................................................................1

28 U.S.C. § 1343..............................................................................................1

29 U.S.C. § 794...............................................................................................1

42 U.S.C. § 12203..........................................................................................30

42 U.S.C. § 1981.................................................................................1, 20, 24

42 U.S.C. § 2000e............................................................................................1

42 U.S.C. §§ 12101..........................................................................................1

## STATEMENT OF JURISDICTION

This is an appeal from a final decision of the United States District Court for the Middle District of Georgia (the "District Court"), so this Court maintains jurisdiction for this appeal pursuant to 28 U.S.C. § 1291. Final judgment in the underlying matter was entered in the District Court on March 31, 2025 (Dkt 15-3, p. 197, Judgment), and Appellants timely filed this appeal on April 30, 2025. (Doc. 15-4, p. 199, Notice of Appeal.)

Before the District Court, Plaintiff-Appellant William Jackson ("Plaintiff") asserted claims against Sumter County pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*.; 42 U.S.C. § 1981; and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. Plaintiff appeals the grant of summary judgment as to his claims pursuant to the ADA and RA. The District Court had subject-matter jurisdiction with respect to those claims pursuant to 28 U.S.C. § 1343(a)(3).

1

## STATEMENT OF THE ISSUES

1.      Whether the District Court erred in granting summary judgment to Sumter County in relation to Plaintiff's claim for discrimination pursuant to the ADA and the RA.

2.      Whether the District Court erred in granting summary judgment to Sumter County in relation to Plaintiff's claim for retaliation pursuant to the ADA and the RA.

## STATEMENT OF STANDARD OF REVIE

This Court conducts a *de novo* review of a district court's award of summary judgment on Plaintiff's claims pursuant to the ADA and RA. *Owen v. I. C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011); *Atchison v. Bd. of Regents of the Univ. Sys. of Ga.*, 802 Fed. Appx. 495, 502-03 (11th Cir. 2020).

2

## STATEMENT OF THE CASE

Plaintiff asserts claims related to Sumter County's employment of his deceased wife Rhonda Jackson ("Jackson").  (Doc. 15-1, pp. 45-5, Amended Compl.; Doc. 15-4, p. 182, MSJ Order, p. 8.)  Jackson was hired by Sumter County on March 11, 2014. (Doc. 15-1, p. 110, Volley Aff., ₱ 6.)  Thereafter, Jackson worked as an administrative assistant for the Sumter County Board of Commissioners (the "Board"), and, in that regard, Jackson had a desk at the entrance to the suite of offices used by the Board (the "BOC Suite").  (Doc. 15-1, p. 110, Volley Aff., ₱ 6; Doc. 15-3, p. 29, Jackson Dep., p. 19:4-14.)  During Jackson's employment with Sumter County, Jackson was the only administrative assistant for the Board.  (Doc. 15-1, p. 110, Volley Aff., ₱ 6; Doc. 15-3, p. 62, Jackson Dep., p. 52:20-22.)  Plaintiff alleges that Jackson suffered from chronic kidney disease, COPD, and congestive heart failure; and Jackson suffered from those conditions since at least 2015.  (Doc. 15-3, pp. 42, 44, 46, 53, Jackson Dep., pp. 32:21-25, 34:12-16, 36:19-23, 43:13-23.)  Plaintiff further alleges that, because of Jackson's health issues, she was more vulnerable to COVID-19. (Doc. 15-3, p. 55-56, Jackson Dep., pp. 45:19-46:9.)  Jackson was dismissed from her employment on April 26, 2022 for violation of the Sumter County Policies and Procedures (the "Policies and Procedures"), specifically Section 21 of the Policies and Procedures that prohibits

harassment (the "Harassment Policy").  (Doc. 15-1, p. 169, Exh. A to Volley Aff., p. 44; Exh. Q to Volley Aff.)

In relevant part, the Harassment Policy states that harassment includes conduct that "has the purpose or effect of (1) creating an intimidating, hostile or offensive working environment, (2) unreasonably interfering with an individual's work performance, or (3) otherwise adversely affecting an individual's employment opportunities." (*Id*., Exh. A, p. 44.)  Under the Policies and Procedures, of which Jackson was familiar, a violation of the Harassment Policy justifies the imposition of disciplinary action.  (Doc. 15-1, Volley Aff., ¶ 40; Doc. 15-1, p. 146, Exh. A to Volley Aff., p. 21; Doc. 15-3, p. 80, Jackson Dep., p. 70:1-4.)

In her role as administrative assistant, one of Jackson's primary job duties was to greet visitors and staff as they entered the BOC Suite. (Doc. 15-1, p. 110, Volley Aff., ¶ 10; Doc. 15-2, pp. 211-12, Exh. B to Volley Aff.)  During Jackson's employment, Jackson's desk was located near the entrance of the BOC Suite such that any visitor or staff member who entered the BOC Suite had to walk past Jackson's desk; in addition, for a staff member to access the mailroom or offices within the BOC Suite, that staff member would have to walk past Jackson's desk. (Doc. 15-1, p. 110, Volley Aff., ¶ 11; Doc. 15-2, p. 24, Harris Aff., ¶ 10.)  Because of the location of Jackson's desk, and the public's access to her work area, during the COVID-19 pandemic, and at all times relevant to this Lawsuit, clear paneling

was erected around Jackson's work area to provide protection against the spread of COVID-19. (Doc. 15-1, p. 110, Volley Aff., ¶ 12; Doc. 15-2, p. 24, Harris Aff., ¶ 11; Doc. 15-3, p. 55, Jackson Dep., p. 45:1-13.) As such, to leave her work area and interact with visitors and/or staff who entered the BOC Suite, Jackson was required to get up from her chair and walk around the paneling. (Doc. 15-1, p. 111, Volley Aff., ¶ 12.)

On March 11, 2022, Nancy Jimenez ("Jimenez"), a clerk for the juvenile court, emailed Deatrice Harris ("Harris"), the Director of Human Resources for Sumter County, and complained that Jackson had been spraying Lysol on or near her (Jimenez) and lodged a complaint against Plaintiff (the "March 11 Email"). (Doc. 15-2, pp. 23-24, Harris Aff., ¶¶ 3, 6; Doc. 15-2, pp. 124-25, Exh. B, pp. 5-6.) In the March 11 Email, Jimenez also alleged that Jackson had been spraying Lysol on or near another clerk for the juvenile court, Angela Williams ("Williams"), and that this conduct had been going on for approximately two months. (*Id*., ¶ 7., Exh. B, pp. 5-6.) Jimenez further alleged that Jackson "walk[ed] directly behind [Jimenez and Williams] as she sprays behind our every step with Lysol" and that she sprayed the Lysol so close to them that on at least one occasion the spray got on Williams's dress and legs and on another occasion into Jimenez's mouth. (*Id*., Exh. B, pp. 5-6.) Jimenez alleged that the conduct was targeted towards her and Williams, and that it occurred regardless of whether she and Williams were wearing a mask. (*Id*.)

5

Jimenez also stated that, because of Jackson's conduct, she and Williams did not "feel comfortable going to the [BOC Suite] to do our daily tasks." (*Id*.)

Harris then initiated an investigation into Jimenez's complaint (the "Investigation"), and, in that regard, Harris met with Jimenez and Williams on March 14, 2022. (*Id*., ¶¶ 12, 15-17.) During Harris's meeting with Williams, Williams reiterated Jimenez's complaints and stated that, on at least one occasion, Jackson sprayed Lysol so close to Williams that Williams's dress and legs got wet from the spray. (*Id*., ¶ 18, Exh. E.) On March 14, 2022, Harris also met with a witness, Latoya McCants, who told Harris that she saw Jackson spray Lysol at "the girls from juvenile," which Harris understood to refer to Williams and Jimenez. (*Id*., ¶¶ 19-20, Exh. F.) McCants also provided Harris with a written statement in which McCants stated that, "[o]n the day of March 10, 2022, one of the ladies from juvenile court entered the [BOC Suite] to use the postage machine, [and Jackson] got up and walked behind her spraying the Lysol directly in the area she was in." (*Id*., Exh. G; *see also Id*., ¶ 21.)

Jimenez emailed Harris again on March 14, 2022 (the "March 14 Email") and pointed to another incident on March 11, 2022 in which Jackson spayed Lysol behind Jimenez and stated that Jackson's behavior was "unacceptable and makes [Jimenez and Williams] uncomfortable to even enter the [BOC Suite] just to do our daily tasks." (*Id*., Exh. B, p. 1.) On March 21, 2022, Williams emailed Harris to

describe her complaints against Jackson (the "March 21 Email"). (*Id.*, ⁋ 23, Exh. H.)  In the March 21 Email, Williams (1) re-iterated her complaints; (2) again described an incident in which Jackson followed her into a "small, confined area . . . and sprayed Lysol directly behind and all around [her] as [Williams] used the postal machine" causing the spray to get on her legs and dress; (3) stated that Jackson does this regardless of whether Williams wears a mask; and (4) that Jackson did not do the same to others. (*Id.*, Exh. H.)  In the March 21 Email, Williams also stated that "[she] do[es] not feel comfortable entering the [BOC Suite] to complete daily tasks for our Court due to [Jackson]'s behavior" and "feel[s] extremely uncomfortable entering the [BOC Suite] because of this issue." (*Id.*)

During an investigation, Harris's normal procedure is to interview the alleged offending party after the complainants are interviewed. (*Id.*, ⁋ 24.)  Because Jackson was out on leave until March 28, 2022, Harris did not meet with Jackson until that day to discuss the complaints against her. (Doc. 15-2, p. 26, Harris Aff., ⁋ 25; Doc. 15-3, p. 90, Jackson Dep., p. 80:6-10.)  During the meeting between Jackson and Harris (the "March 28 Meeting"), Harris explained the allegations against Plaintiff but did not name the complainants; Jackson, however, already knew who the complainants were without Harris telling her, and Jackson told Harris that she (Jackson) knew it was Jimenez and Williams who had lodged the complaints. (Doc. 25-2, p. 26, Harris Aff., ⁋ 27.)  Jackson did not deny the allegations against her

7

during the March 28 Meeting but stated that Jimenez and Williams did not like her because of past issues with a former co-worker. (Doc. 15-3, p. 95, Jackson Dep., pp. 85:25-86:3; Doc. 15-2, p. 26, Harris Aff., ⁋ 27.)

Per Harris's request during the March 28 Meeting, Jackson provided Harris with a written response to the complaints against her ("Jackson's Response"). (Doc. 15-2, p. 26, Harris Aff., ⁋⁋ 29-30; Doc. 15-2, p. 144-45, Exh. K to Harris Aff.; Doc. 15-3, p. 96, Jackson Dep., p. 86:4-16.) In Jackson's Response, Jackson denied that she had harassed Jimenez and Williams, and Jackson stated that she had an underlying health condition so she sprayed Lysol when any individual entered the BOC Suite without a mask as a safety precaution. (Doc. 15-2, p. 27, Harris Aff., ⁋ 31; Doc. 15-2, p. 144-45; Doc. 15-2, p. 144, Exh. K to Harris Aff.) According to Harris, prior to receiving Jackson's Response, she (Harris) was not aware that Jackson had any chronic underlying health issues that required Jackson to spray Lysol in her office or to take any other precautions beyond that of an ordinary individual to avoid sickness. (Doc. 15-2, p. 27, Harris Aff., ⁋ 32.)

After reviewing Jackson's Response, the statements from Jimenez and Williams (the March 11 Email, March 14 Email, and March 21 Email), the McCants Statement, and her notes, Harris determined that Jackson was not credible and that the evidence substantiated the allegations of Jimenez and Williams. (*Id.*, ⁋ 33.) According to Harris, upon receipt of a complaint, her role was to investigate the

8

complaint to determine if the allegations could be substantiated and to make a recommendation as to whether discipline was warranted and what any such discipline should entail. (*Id*., ¶ 12.) Harris ordinarily did not inform the supervisor of the employee against whom a complaint was lodged until the investigation was complete; and it was the supervisor who had the authority to discipline the employee – not Harris. (Doc. 15-2, p. 24, Harris Aff., ¶ 13; *see also* Doc. 15-1, p. 111, Volley Aff., ¶ 19.) Further, according to Harris, it is not unusual for a direct supervisor to disagree with Harris's recommendation with respect to discipline. (Doc. 15-2, p. 25, Harris Aff., ¶ 14.)

Here, Harris drafted a letter dated April 12, 2022 (the "April 12 Letter") in which Harris summarized the findings of the Investigation and provided a recommendation in regard to disciplining Jackson. (*Id*., ¶ 34; Doc. 15-2, pp. 147-78, Exh. L to Harris Aff..) In the April 12 Letter, Harris stated that the Investigation had substantiated the complaints by Jimenez and Williams, noting (1) that Jackson did not initially deny the allegations; (2) that Jackson never denied spraying Lysol behind Jimenez and Williams; and (3) that the evidence showed Jackson did not spray Lysol behind others in a similar fashion. (*Id*..) Thus, Harris found that Jackson's behavior was "unprofessional and offensive" and "cause[d] an offensive and hostile environment," and Harris recommended that Jackson be given a written reprimand. (*Id*.)

At the time of the Investigation, Jackson's supervisor was the county administrator, Rayetta Volley ("Volley"). (Doc. 15-1, p. 110, Volley Aff., ₱ 7; Doc. 15-2, p. 24, Harris Aff., ₱ 9; Doc. 15-3, p. 32, Jackson Dep., p. 22:3-9.) Harris did not inform Volley of the complaints against Jackson until Harris had completed the Investigation. (Doc. 15-1, p. 113, Volley Aff., ₱ 19; Doc. 15-2, pp. 27-28, Harris Aff., ₱₱ 33-36.) On or about April 12, 2022, Harris informed Volley of the complaints against Jackson by Jimenez and Williams, informed Volley that Harris had completed an investigation into those complaints and provided Volley with the April 12 Letter. (Doc. 15-1, p. 111, Volley Aff. ₱₱ 13-14; Doc. 15-2, pp. 27-28, Harris Aff., ₱ 36.) At that time, Harris also informed Volley that Jimenez and Williams had relayed to Harris that they found Jackson's conduct to be unprofessional and offensive and that it made them uncomfortable in performing their daily tasks, which included entering the BOC Suite daily or regularly to access the mailroom. (Doc. 15-1, p. 111, Volley Aff., ₱ 15; Doc. 15-2, pp. 27-28, Harris Aff., ₱ 36.) Also, on April 12, 2022, Harris provided Volley with materials related to the Investigation, including a memorandum Harris prepared with respect to the Investigation (the "Investigation Memorandum"), the April 12 Letter, the March 11 Email, the March 14 Email, the March 21 Email, the McCants Statement, and Jackson's Response. (Doc. 15-1, pp. 111-12, Volley Aff., ₱ 17; Doc. 15-2, p. 28, Harris Aff., ₱ 37, Doc. 15-2, p. 142, Exh. J to Harris Aff.)

10

As Jackson's supervisor, Volley had the authority to discipline Jackson and to determine what such discipline should entail. (Doc. 15-1, p. 113, Volley Aff., ⁋ 19; Doc. 15-2, p. 24, Harris Aff., ⁋ 13.) Prior to determining how Jackson should be disciplined, Volley wanted to meet with Jackson and review the materials related to the Investigation that Volley received from Harris. (Doc. 15-1, p. 113, Volley Aff., ⁋ 20.) A few days after April 12, 2022, Volley and Harris met with Jackson to discuss the allegations against her (the "Initial Meeting"). (Doc. 15-, p. 113, Volley Aff. ⁋ 21; Doc. 15-2, p. 28, Harris Aff., ⁋ 38.) In the Initial Meeting, after Jackson was informed of the allegations against her, Jackson claimed that she sprayed Lysol behind Jimenez and Williams when Jimenez and Williams entered the BOC Suite without wearing masks; that she also sprayed Lysol behind others who entered the BOC Suite without wearing masks; and claimed that she did this because she had underlying health conditions, including COPD and chronic kidney disease, that made her more vulnerable to COVID-19. (Doc. 15-1, p. 113, Volley Aff., ⁋ 22; Doc. 15-2, p. 28, Harris Aff., ⁋ 39.) Prior to April 2022, Volley was not aware that Jackson suffered from COPD, chronic kidney disease, congestive heart failure or any underlying health condition that caused Plaintiff to be more vulnerable to COVID-19. (Doc. 15-1, p. 114, Volley Aff, ⁋ 23; Doc. 15-3, p. 59, Jackson Dep. p. 49:15-23.) According to Harris, prior to the Initial Meeting, there was no

11

documentation on file with Sumter County to suggest that Jackson suffered from any underlying conditions.  (Doc. 15-2, p. 28, Harris Aff., ¶ 40.)

During the Initial Meeting, Jackson was informed that Harris had found that Jackson had violated the Harassment Policy; that Harris had recommended that Jackson receive a written reprimand due to that violation; and that Volley would consider Harris's recommendation and findings and determine if and how Jackson should be disciplined.  (Doc. 15-1, p. 114, Volley Aff., ¶ 26; Doc. 15-2, p. 28, Harris Aff., ¶ 42.)  Further, during the Initial Meeting, after being informed of Jackson's health conditions, Volley requested that Jackson provide her with documentation regarding those conditions and Volley stated that she (Volley) would consider any such documentation in her determination as to whether Jackson should be disciplined for the conduct alleged by Jimenez and Williams.  (Doc. 15-1, p. 114, Volley Aff., ¶ 27; Doc. 15-2, p. 28, Harris Aff., ¶ 43.)  In response, Jackson agreed to provide Volley with documentation regarding her underlying health conditions. (Doc. 15-1, p. 114, Volley Aff., ¶ 27; Doc. 15-2, p. 29, Harris Aff., ¶ 44.)

Moreover, during the Initial Meeting, after Jackson informed Volley of Jackson's health conditions, Volley asked if Jackson required any accommodations in regard to her health conditions.  (Doc. 15-1, p. 114, Volley Aff., ¶ 28; Doc. 15-2, p. 28, Harris Aff., ¶ 43.)  Jackson then informed Volley that there was a chair near her desk where visitors to the BOC Suite would regularly sit and that, oftentimes,

12

visitors who sat in that chair did not wear masks, which made Jackson uncomfortable.  (Doc. 15-3, p. 99, Jackson Dep., pp. 89:20-90:21; Doc. 15-1, p. 114, Volley Aff., ⁋ 28; Doc. 15-2, p. 29, Harris Aff., ⁋ 44.)  The day of the Initial Meeting or the next day, Volley ensured that the chair near Jackson's desk was moved pursuant to Jackson's request.  (Doc. 15-3, p. 99, Jackson Dep., pp. 89:20-90:21; Doc. 15-1, p. 115, Volley Aff., ⁋ 29; Doc. 15-2, p. 29, Harris Aff., ⁋ 45.)  Jackson did not request any other accommodations after informing Volley and Harris of her health conditions.  (Doc. 15-1, p. 115, Volley Aff., ⁋ 30; Doc. 15-2, p. 29, Harris Aff., ⁋ 46.)

On or about April 19, 2022, Jackson provided Volley with a note from Dr. Joseph Stephen McClendon of Albany Internal Medicine (the "McClendon Note") that stated Jackson was being treated for COPD and that "she needs to take extra precautions outside of her home to protect herself against COVID and other respiratory infections."  (Doc. 15-1, p. 115, Volley Aff., ⁋ 32; Doc. 15-1, p. 234, Exh. I to Volley Aff.; Doc. 15-3, pp. 44-46, Jackson Dep., pp. 34:17-36:4.)   On or about April 20, 2022, Jackson provided Volley with a note from Dr. Tamorie Smith of Renal Associates, LLS (the "Smith Note") that stated Jackson "is a patient under my care that I treat for Chronic Kidney Disease stage 4" and that Jackson had been advised to "avoid any interaction with any person with known covid or suspected

13

covid." (Doc. 15-1, p. 115, Volley Aff., ¶ 33; Doc. 15-1, p. 236, Exh. J to Volley Aff.; Doc. 15-3, pp. 47-48, Jackson Dep., p. 37:23-38:5.)

Volley delayed making a decision regarding the disciplining of Jackson until Volley received the McClendon Note and Smith Note from Jackson. (Doc. 15-1, p. 115, Volley Aff., ¶ 34.) Volley was also delayed in determining such because of the other responsibilities of her job, including, during that time, preparing the county budget. (*Id.*, ¶ 35.)

On or about April 22, 2022, Jackson provided a letter to the Board (the "Grievance"). (*Id.*, ¶ 54; Doc. 15-1, p. 238, Exh. K to Volley Aff.) In the Grievance, Jackson informed the Board that she was lodging a grievance regarding the Investigation and stated that she disagreed with the findings by Harris in the Investigation. (*Id.*) Jackson also complained about the manner in which Harris had conducted the Investigation, specifically complaining that Harris had not interviewed certain individuals. (*Id.*) Jackson intended the Grievance to be an appeal of the discipline recommended in the April 12 Letter pursuant to the Grievance Procedure. (Doc. 15-3, pp. 101, 103, 105, Jackson Dep., pp. 91:15-92:12, 93:17-95:17; Doc. 15-2, p. 29, Harris Aff., ¶¶ 49-51; Doc. 15-1, p. 121, Volley Aff., ¶¶ 58-59.) The Policies and Procedures provide for a grievance and/or appeal to discipline (the "Grievance Procedure"), and under the Grievance Procedure, as Jackson's supervisor and department head, Volley had to meet with Jackson and

14

Harris to discuss Jackson's grievance before it could go any further.  (Doc. 15-1, p. 120, Volley Aff., ℙ 56, Doc. 15-1, p. 150, Exh. A, p. 25.)   Thus, on April 22, 2022, the day Jackson provided the Grievance to the Board, Volley emailed Jackson to inform Jackson that she had received the Grievance and to inform Jackson that the Grievance was at "step 1" of the Grievance Procedure (the "April 22 Email").  (*Id.*, ℙ 56, Doc. 15-1, p. 242, Exh. L to Volley Aff.)

On April 25, 2022, Volley and Harris met with Jackson to discuss the Grievance (the "April 25 Meeting").  (Doc. 15-2, p. 29, Harris Aff., ℙ 49; Doc. 15-1, p. 121, Volley Aff., ℙ 57.)  During the April 25 Meeting, Jackson discussed her desire to file a grievance with regard to the April 12 Letter, and Volley informed Jackson that the April 12 Letter was only a recommendation as to what discipline Jackson would receive and that Volley would make the determination as to what discipline Jackson would receive.  (Doc. 15-1, p. 121, Volley Aff., ℙ 59; Doc. 15-2, p. 29, Harris Aff., ℙ 51; Doc. 15-3, pp. 101-102, Jackson Dep., p. 91:15-92:12.)

On that same day, April 25, 2022, after Volley and Harris met with Jackson, Harris drafted a memorandum to Volley that summarized the Investigation, her findings pursuant to the Investigation, and provided her recommendation as to the discipline to be given to Jackson (the "April 25 Memorandum").  (Doc. 15-1, p. 121, Volley Aff., ℙ 60, Exh. M; Doc. 15-2, p. 30, Harris Aff, ℙ 52, Exh. P.)  Prior to reaching a determination in regard to Jackson's discipline, Volley reviewed the

15

materials provided by Harris, including the April 12 Letter; the Investigation Memorandum; the March 11 Email; the March 14 Email; the March 21 Email; the McCants Statement; Jackson's Written Statement; and the Policies and Procedures, particularly the Harassment Policy. (Doc. 15-1, p. 116, Volley Aff., ¶ 36.) Volley also met with the county attorney prior to determining what discipline was warranted. (*Id*., ¶ 51.)

Volley understood at the time that, according to the Harassment Policy, any conduct that has the effect of "creating an intimidating, hostile or offensive working environment"; "unreasonably interfering with an individual's work performance"; or "otherwise adversely affecting an individual's employment opportunities" can amount to harassment. (*Id*., ¶ 38.) Regarding discharges from employment, the Policies and Procedures state that "discharges for cause shall be initiated by the Supervisor . . . when alternative personnel actions . . . are not deemed sufficient, appropriate or in the best interest of the County." (*Id*., ¶ 42; Doc. 15-1, p. 146, Exh. A, p. 23.) Based on her review of the Investigation materials, including the April 12 Letter, the Investigation Memorandum, the March 11 Email, the March 14 Email, the March 21 Email, and Jackson's Response, Volley determined that Jackson had violated the Harassment Policy and that Jackson's conduct had created a hostile work environment for Jimenez and Williams. (Doc. 15-1, p. 118, Volley Aff., ¶ 44.) Volley reached the conclusion that Jackson had violated the Harassment Policy and

16

created a hostile work environment because:  (1) she determined Jackson's conduct was targeted at Jimenez and Williams based on the Investigation; (2) she determined that the evidence did not support Jackson's claim that she merely sprayed Lysol behind any individual who was not wearing a mask; (3) Jackson did not deny the conduct when she first met with Harris and only raised the issue of her health conditions after she was told that Harris had found she had violated the Harassment Policy; and (4) the evidence showed that Jackson's conduct was intimidating to Jimenez and Williams and interfered with the ability of Jimenez and Williams to perform their jobs and complete their daily tasks in a comfortable and professional setting because they were not comfortable entering the BOC Suite.  (*Id*., ¶¶ 46-48.)

Based on the conclusion that Jackson violated the Harassment Policy and created a hostile work environment, and because Volley determined that Jackson's behavior showed her unfit to be the public face of Sumter County as administrative assistant to the Board, Volley determined that Jackson's conduct warranted dismissal from her employment.  (*Id*., ¶¶ 49-53.)  Thus, on April 26, 2022, Volley emailed Harris (the "April 26 Email") and informed Harris that she (Volley) had reviewed Harris's recommendation as to Jackson's discipline but that Volley had determined that Jackson's conduct warranted dismissal because "[Jackson's behavior] was purposeful, unprofessional, and intimidating" and that it "create[ed]

17

a hostile work environment for other employees." (*Id*., �ℙ 61; Doc. 15-2, p. 14, Exh. N to Volley Aff.; Doc. 15-2, p. 30, Harris Aff., ⅋ 53.)

On April 26, 2022, Volley and Harris met with Jackson to inform Jackson that she was being dismissed from her employment (the "April 26 Meeting").  (Doc. 15-1, p. 122, Volley Aff., ℙ 63-65; Doc. 15-2, p. 30, Harris Aff., ℙ 55.)  During the April 26 Meeting, after Jackson was informed she was being dismissed, Jackson provided Volley and Harris with a resignation letter that she had drafted.  (Jackson's Dep., 100:22-101:14; Doc. 15-1, p. 122, Volley Aff., ℙℙ 63-65; Doc. 15-2, p. 16, Exh. O; Doc. 15-2, p. 30, Harris Aff., ℙ 56; Doc. 15-2, p. 169, Exh. S to Harris Aff.)  Jackson, however, was told that her resignation would not be accepted and that she was being dismissed effective that day for violation of the Harassment Policy.  (Doc. 15-1, p. 122, Volley Aff., ℙℙ 63-65; Doc. 15-2, p. 30, Harris Aff., ℙ 57; Doc. 15-3, p. 112, Jackson Dep., p. 102:16-22.)  To that end, Jackson was provided a letter drafted by Harris that stated she was being dismissed from her employment for violation of the Harassment Policy (the "Dismissal Letter") and a separation notice stating that she was being dismissed for cause effective April 26, 2022 (the "Separation Notice").  (Doc. 15-1, p. 122, Volley Aff., ℙ 65; Doc. 15-1, p. 18, Exh. P to Volley Aff.; Doc. 15-2, p. 21, Exh. Q to Volley Aff.; Doc. 15-2, p. 30, Harris Aff., ℙℙ 54, 58; Doc. 15-2, p. 169, Exh. S to Harris Aff.; Doc. 15-2, p. 171, Exh. T to Harris Aff.; Doc. 15-3, p. 112, Jackson Dep., p. 102:7-11.).

On September 2, 2022, Jackson filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") in which Jackson alleged that she had "been discriminated against because of [her] disability and subjected to retaliatory discharge in violation of Title I of the Americans with Disabilities Act of 1990 as amended (ADA)." (Doc. 15-3, p. 143, Jackson Dep., Exh. 14, p. 4.) Jackson received her notice of right to sue from the EEOC on September 15, 2022. (*Id*., p. 6.) Jackson filed this lawsuit on December 8, 2022. (Doc. 15-1, pp. 21-29, Compl.) Jackson later filed an amended complaint, and that amended complaint is the operative complaint. (Doc. 15-1, pp. 45-53, Amended Compl.).

After Jackson's death, the District Court entered an order allowing Plaintiff to be substituted for Jackson as the plaintiff in this action. (Doc. 15-4, p. 182, MSJ Order, p. 8.) Sumter County filed for summary judgment on January 2, 2024. (Doc. 15-1, p. 65, Sumter County's MSJ.) On March 31, 2025, the District Court granted Sumter County's motion for summary judgment. (Doc. 15-4, pp. 175-195, MSJ Order.) On that same day, the district court entered judgment in favor of Sumter County. (Doc. 15-4, p. 197, Judgment.) Plaintiff timely filed a notice of appeal of the District Court's grant of summary judgment, initiating this appeal. (Doc. 15-4, p. 199, Notice of Appeal.)

## SUMMARY OF ARGUMENT

The District court did not err in granting summary judgment to Sumter County as to both Plaintiff's claim for discrimination pursuant to the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") and Plaintiff's claim for retaliation pursuant to the ADA and RA. Plaintiff's claims are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case, and, if Plaintiff can do so, the burden shifts to Sumter County to present a legitimate non-discriminatory and/or non-retaliatory reason for Jackson's dismissal. *Id*. If Sumter County carries that burden, Plaintiff must then show that the legitimate non-discriminatory and/or non-retaliatory reason for Jackson's dismissal is pretext for discrimination and/or retaliation. *Id*. Regardless of this burden-shifting, at all times, the plaintiff retains the ultimate burden of establishing discrimination or retaliation. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here, Plaintiff cannot establish a prima facie case of either discrimination or retaliation. As it relates to Plaintiff's discrimination claim, the District Court correctly found that Plaintiff cannot show a prima facie case of discrimination because Plaintiff cannot show that Jackson was dismissed because of her disability. Particularly, Plaintiff cannot show that the relevant decision makers (Harris and

20

Volley) were aware of Jackson's alleged disability at the time the Investigation that led to her dismissal was initiated. Moreover, Plaintiff cannot show a prima facie case of discrimination through a "convincing mosaic" theory. As it relates to Plaintiff's retaliation claim, the District Court correctly limited its analysis of that claim to whether the Grievance can support that claim. The District Court correctly determined that the Grievance is not conduct protected by the ADA or RA and that, therefore, Plaintiff has not established a prima facie case of retaliation.

Further, even if Plaintiff could establish a prima facie case, Sumter County has shown that Jackson was dismissed for a legitimate non-discriminatory and/or non-retaliatory reason (her violation of the Harassment Policy). Plaintiff cannot show this legitimate non-discriminatory and/or non-retaliatory reason for Jackson's dismissal was pretext for discrimination or retaliation. Moreover, Plaintiff cannot carry his ultimate burden of showing that discrimination and/or retaliation was the reason for Jackson's dismissal.

Accordingly, this Court should affirm the District Court's grant of summary judgment to Sumter County.

## ARGUMENT AND CITATION OF AUTHORITY

The District Court did not err in granting summary judgment to Sumter County. As noted, this Court performs a de novo review of a district court's grant of summary judgment. *Atchison*, 802 Fed. Appx. at 502-3. In doing so, this Court views facts "in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. Rule Civ. Proc. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248 (1986). There is so no "genuine issue for trial" where a rational fact finder could not find for the nonmoving party considering the record as a whole. *Matsushita*, 475 U.S. at 586-87.

Here, Plaintiff asserts two claims: (1) that Jackson was discriminated against because of her disability (Count I); and (2) that Jackson suffered retaliation as a result of the Grievance (Count II). For Plaintiff to prevail on either of his claims (discrimination or retaliation), Plaintiff must establish that Jackson was subjected to

22

an adverse employment action and that this adverse employment action was done with unlawful discriminatory or retaliatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). A plaintiff may show discriminatory or retaliatory intent through (1) direct evidence or (2) by circumstantial evidence under the burden-shifting test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc); *Smith v. Library Board of Homewood*, 2018 WL 2011026, at *4 (N.D. Ala. Apr. 30, 2018) (citation omitted); *Cribbs v. NFI Network Log. Sols., LLC*, 2014 WL 4805328, at *4 (S.D. Ga. Sept. 26, 2014) (citation omitted).

Here, Plaintiff has no direct evidence of discrimination or retaliation. Thus, Plaintiff's retaliation and discrimination claims are analyzed under the burden-shifting framework established in *McDonnell Douglas*. *See Batson v. Salvation Army*, 897 F.3d 1320, 1328-29 (11th Cir. 2018) (citation omitted) ("Where . . . an employee alleges retaliation under the . . . ADA without direct evidence of the employer's intent, we apply the burden shifting framework established in *McDonnell Douglas*[.]"); *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) (explaining that the *McDonnell Douglas* framework generally applies to disability discrimination claims under the ADA); *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1226; *see also*

23

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997); and *Starkey*

*v. Colquitt Cnty. Bd. of Comm'rs*, 2014 WL 6679117, at *5 (M.D. Ga. Nov. 25, 2014)

("[E]mployment discrimination claims under the ADA are analyzed under the same

framework as those brought under Title VII.").

> Under the *McDonnell Douglas* framework, the plaintiff must prove a
> *prima facie* case of discrimination [or retaliation] by a preponderance
> of the evidence. If plaintiff fails to satisfy any one of the elements of a
> *prima facie* case, summary judgment against the plaintiff is appropriate.
> If, however, the plaintiff identifies sufficient evidence of a *prima facie*
> case, the defendant must then produce a legitimate, non-discriminatory
> reason to explain the challenged action. This burden is 'exceedingly
> light;' the defendant must merely proffer a non-discriminatory reason,
> not prove it . . . .
> . . . .
> Once a defendant proffers a non-discriminatory reason, the burden
> shifts back to the plaintiff to prove the proffered reason is mere pretext
> for the true discriminatory motive. To show that a defendant's stated
> reasons are pretext, the plaintiff must offer evidence demonstrating that
> the proffered reason was not the true reason for the employment
> decision.

*Jean-Francois v. Anderson*, 2008 WL 5272864, *7 (M.D. Ga. 2017). Regardless of

this burden-shifting, at all times, the plaintiff retains the ultimate burden of

establishing discrimination or retaliation. *See Tex. Dep't of Cmty. Affairs v. Burdine*,

450 U.S. 248, 253 (1981).

Here, Plaintiff cannot establish a prima facie case of discrimination or

retaliation. Moreover, Sumter County can show that a legitimate non-discriminatory

and/or non-retaliatory reason for the challenged employment action (Jackson's

dismissal), and Plaintiff cannot show that that legitimate non-discriminatory and/or

24

non-retaliatory reason for Jackson's dismissal was pretext for discrimination or retaliation. Finally, Plaintiff cannot carry his ultimate burden of showing that discrimination and/or retaliation was the reason for Jackson's dismissal. Accordingly, the District Court did not err in granting summary judgment in favor of Sumter County, and this Court should affirm the decision of the District Court.

**I.      Plaintiff cannot establish a prima facie case of discrimination.**

Plaintiff asserts discrimination claims pursuant to the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act (the "RA"). Specifically, Plaintiff alleges that Jackson's dismissal from her employment with Sumter County was discriminatory. To state a prima facie claim of discrimination under either the ADA or RA, Plaintiff must show: "(1) [Plaintiff was] disabled; (2) [Jackson was] a qualified individual; and (3) [Jackson] was subjected to unlawful discrimination because of [her] disability." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1254–55 (11th Cir. 2007); (citation omitted); *see also See Silberman v. Miami Dade Transit,* 927 F.3d 1123, 1133–34 (11th Cir. 2019) (courts employ the same analytical framework to analyze claims under the ADA and RA). It is not in dispute whether Plaintiff can show the first two elements of a prima facie case; however, Plaintiff cannot show that Jackson was subjected to discrimination *because of* Jackson's disability. *See id*.

25

Plaintiff cannot show the Investigation and the resulting dismissal of Jackson was *because of* Jackson's disability. Notably, Plaintiff cannot show that the relevant decision-makers – Harris and Volley – were even aware of Jackson's alleged disability until after the Investigation was initiated. Plaintiff argues that Jackson's "personnel file contained a record of her disability" based on Jackson's disclosure to prior supervisors (Janis Jarvis and Bill Twomey) that Jackson had serious medical issues. (Plaintiff's Brief, p. 47.) Further, Plaintiff argues that Harris should have been aware of Jackson's disability because she was the "gatekeeper" of Jackson's request for FMLA leave. (*Id*.) But it is undisputed that neither Harris nor Volley were aware that Jackson had a chronic underlying health issue (a disability) that required her to spray Lysol in her office or otherwise take extraordinary precautions to avoid sickness. (Doc. 15-2, p. 27, Harris Aff., ₱ 31; Doc. 15-1, p. 114, Volley Aff., ₱ 24.) Indeed, Volley testified that the Initial Meeting was the first time, to her knowledge, that anyone from Sumter County was made aware that Jackson had an underlying health issue that caused her to be vulnerable to COVID-19. (Doc. 15-1, p. 114, Volley Aff., ₱ 24.) And Jackson provided documentation to Volley regarding her health issues on April 19 and April 20, 2022 – not only after the Investigation had been initiated but after Harris had provided Volley with her determination that Jackson had violated the Harassment Policy. (*Id*., ₱₱ 32-33.) As such, it simply

26

cannot be said that the Investigation and Jackson's resulting dismissal were done because of Jackson's disability.

In his brief, Plaintiff argues that his claims can survive summary judgment because she has shown a "convincing mosaic" of circumstantial evidence. (Plaintiff's Brief, p. 31.)  The district court, however, correctly held that Plaintiff fails to show sufficient evidence to survive under a "convincing mosaic" theory. (Doc. 15-4, pp. 183-190, MSJ Order, pp. 9-16.)  To survive summary judgment under this theory, "[a] plaintiff's mosaic may be made up of, among other things, (1) "suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) systemically better treatment of similarly situated employees; and (3) evidence that the employer's justification is pretextual." *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1198 (11th Cir. 2024).  Further, a plaintiff must present evidence that would allow a jury to "infer intentional [disability] discrimination." *Id*. at 1191.  Here, Plaintiff's "mosaic" is composed of (1) the close temporal proximity between Volley's knowledge of Jackson's disability and Jackson's dismissal and (2) Plaintiff's arguments that the stated reason for Jackson's dismissal are pretext.  This "mosaic" fails to support an inference that discrimination was the true reason behind Jackson's dismissal.  *See id*.

In support of his discrimination claim, Plaintiff relies heavily on the timing of Jackson's dismissal in relation to when Volley became aware of Jackson's disability.

It is undisputed that Volley was aware of Jackson's disability when she made the decision to dismiss Jackson; indeed, this is because Jackson brought her disability to Volley's attention through the Investigation. Jackson testified that she did not inform Volley that she suffered from her disabilities – congestive heart failure, COPD, and chronic kidney disease – until April 2022. (Doc. 15-3, p. 59, Jackson Dep., p. 49:15-23.) And as discussed, Volley stated that she was not aware of Jackson's disabilities until that time. (Doc. 15-1, p. 114, Volley Aff., ⁋ 23.) Jackson did not raise these issues and bring them to Volley's attention until *after* Jackson had been informed of the allegations against her. Thus, Volley became aware of these disabilities in close proximity to her decision to dismiss Jackson, but that knowledge also came about as a part of the Investigation that led to Jackson's dismissal.

Plaintiff's argument in regard to the timing of Jackson's dismissal is also undercut by Plaintiff's own arguments in his brief. Plaintiff argues that he has presented circumstantial evidence that Jackson's superiors at Sumter County knew of Jackson's disability as far back as 2015 and that Volley knew of her disability since at least September 2021. (Plaintiff's Brief, pp. 35-36.) Further, Plaintiff argues that Volley and/or Harris were aware of Jackson's medical issues because of her frequent absences from work. (Id.) Setting aside Jackson's testimony that she did not inform Volley of her disabilities until April 2022, and accepting Plaintiff's version that Volley was aware of her medical issues since at least September 2021,

28

seven months prior to her dismissal, and that Sumer County was aware of her medical issues since 2015, it cannot be said that there was suspicious timing as it relates to when Volley or Sumter County became aware of Jackson's disabilities and her dismissal.

Plaintiff's other evidence in support of the convincing mosaic theory relate to the pretext analysis are discussed below and are without merit. In short, Plaintiff's "mosaic" of circumstantial evidence fails to support an inference that discrimination was the true reason for her dismissal.

## II. Plaintiff cannot establish a prima facie case of retaliation pursuant to the ADA and/or the RA.

As discussed, in addition to his discrimination claim, Plaintiff asserts a retaliation claim pursuant to the ADA and the RA.[1] To establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Here, Plaintiff cannot show a prima facie case because (1) Plaintiff cannot show Jackson engaged in statutorily protected expression and (2)

---

[1] The "anti-discrimination provision of the Rehabilitation Act incorporates the anti-retaliation provision of the ADA," and a claim for "retaliation under the Rehabilitation Act is the same as that under the ADA." *Albra v. Cit of Fort Lauderdale*, 232 Fed. Appx. 885, 891 (11th Cir. 2007).

Plaintiff cannot show that Sumter County's stated reason for Jackson's dismissal was pretext for retaliation.

In regard to whether Plaintiff can show Jackson engaged in statutorily protected expression, the district court correctly concluded that Plaintiff had not shown such protected expression and that her claim failed for this reason. (Doc. 15-4, pp. 190-93, MSJ Order, pp. 16-19.) The "anti-retaliation provision of the ADA [and RA] prohibits discrimination against an individual because that individual 'opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing' conducted under the statute." *Higdon v. Jackson*, 393 F.3d 1211, 1218 (11th Cir. 2004) (alteration in original) (quoting 42 U.S.C. § 12203(a)). To that end, the ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). Thus, to state a retaliation claim under the ADA, Plaintiff must allege that Jackson's dismissal was causally related to her opposition to conduct made illegal by the ADA. Plaintiff cannot make that showing.

In Count II of Plaintiff's amended complaint, Plaintiff alleges that Jackson "engaged in protected activity by filing a grievance due to the accusation of her co-workers and treatment by [Sumter County] because of her disabilities." (Doc. 15-1,

30

p. 50, Amended Compl., ⁋ 25.)  In other words, Plaintiff's retaliation claim is based on her allegation that she was dismissed in retaliation for the Grievance.  The gravamen of the Grievance was an objection to the Investigation, particularly how Harris conducted the Investigation and Harris's recommendation that Plaintiff be disciplined.  (Doc. 15-3, pp. 101-102, 103, 105, Jackson Dep., pp. 91:15-92:12, 93:17-95:17; Doc. 15-2, p. 29, Harris Aff., ⁋⁋ 49-51; Doc. 15-1, p. 121, Volley Aff., ⁋⁋ 58-59.)  In accordance with the Grievance Policy, Jackson intended the Grievance to be an appeal of what she understood to be the decision to discipline her for violation of the Harassment Policy.  (*Id*.)  As such, the Grievance was not intended to oppose an act or practice made unlawful by the ADA but merely to exercise Jackson's right to an appeal under the Grievance Procedure.  Moreover, even if it can be said that Jackson complains in the Grievance that she was treated unfairly, she does not allege in the Grievance that she was treated unfairly *because* of her disability.  *See Satchel v. Sch. Bd. of Hillsborough Cnty.*, 2007 WL 3023948, at *2 (M.D. Fla. Aug. 25, 2006), *aff'd*, 251 Fed. Appx. 626 (11th Cir. 2007) (plaintiff had not alleged protected activity because she did not allege she was harassed because of her disability).  Thus, the Grievance is not statutorily protected speech that can support a retaliation claim under the ADA or RA.  *See Gary v. City of Warner Robins, Georgia*, 2018 WL 3825220, at *12 (M.D. Ga. Aug. 10, 2018) (concluding that plaintiff's grievance was not a "statutorily protected activity . . . because [it] did

31

not put [the defendant] on notice she was opposing any unlawful conduct under . . . the ADA"); *see also Bargoot v. Sch. Bd. of Palm Beach Cnty*., 2022 WL 293313, at *6 (S.D. Fla. Feb. 1, 2022).

To be a protected activity, a plaintiff must "have a good faith, objectively reasonable belief that his activity is protected by the [ADA]." *Belgrave v. Public Super Market, Inc.*, 2013 WL 3477790, *4 (11th Cir. 2023). Here, Jackson testified that the basis for the Grievance was that Jackson disagreed with Harris's findings in the Investigation and how Harris conducted the Investigation, specifically that she did not interview certain witnesses. (Doc. 15-3, pp. 101-102, 103-105, Jackson Dep., pp. 91:15-92:12, 93:17-95:17.) At Jackson's deposition, Jackson did not mention her disability as a reason for the Grievance. (*Id*.) Thus, it simply cannot be said that Jackson had a good faith belief that the Grievance was ADA protected conduct. Therefore, because Plaintiff cannot show Jackson engaged in statutorily protected conduct, Plaintiff has not stated a prima facie claim for retaliation under the ADA.

As discussed, in the amended complaint, Plaintiff refers only to the Grievance in support of his retaliation claim. To that end, at her deposition, Jackson testified that her retaliation claim was based on the Grievance. (Doc. 15-3, p. 108, Jackson Dep. p. 98:4-11.) However, in response to Sumter County's motion for summary judgment, and on appeal, Plaintiff alleges that Jackson was retaliated against because

32

Jackson engaged in protected conduct by informing Sumter County of her disability, requesting an accommodation, and "engaging in the interactive process." (Doc. 15-4, pp. 155-56, Plaintiff's MSJ Response, pp. 13-14.) "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014). Thus, Plaintiff cannot now rely on these "new factual ba[ses for her retaliation claim] when it was raised in [her] opposition to summary judgment." *Id*. (quoting *Gilmour v. Gates, et. al.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). For this reason, the District Court determined that Plaintiff cannot rely on protected activity other than the Grievance. (Doc. 15-4, pp. 191-92, MSJ Order, pp. 17-18.)

Plaintiff argues the district court erred in refusing her additional arguments regarding protected conduct. Specifically, Plaintiff argues that her amended complaint "discussed" these other protected activities, and, therefore, the District Court should not have declined to consider those additional protected activities. At best, the amended complaint does discuss the additional protected activities in Plaintiff's recitation of the facts. But the amended complaint specifically states that Plaintiff's retaliation claim is based on the Grievance and no other protected activities. Thus, the District Court did not err in declining to consider Plaintiff's alleged additional protected activities.

In addition, regardless of whether Plaintiff has shown that Jackson engaged in statutorily protected conduct, like Plaintiff's discrimination claim, Plaintiff's retaliation claim further fails because Plaintiff has not carried his burden to show that Sumter County's stated reason for Jackson's dismissal was pretext for a retaliatory motive.

### III. Jackson's violation of the Harassment Policy is a legitimate non-discriminatory reason for her dismissal.

As discussed, even if it can be said that Plaintiff established a prima facie case of discrimination or retaliation, Sumter County is still entitled to summary judgment if it can point to a legitimate, non-discriminatory reason for Jackson's dismissal. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Notably, Sumter County's burden with regard to a legitimate non-discriminatory reason for Jackson's dismissal is "merely one of production; [Sumter County] 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the [employer]'s evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quoting *Burdine*, 450 U.S. at 254–55); *see also Perryman v. Johnson Prods., Co.*, 698 F.2d 1138, 1142 (11th Cir.1983) (describing the employer's burden as "exceedingly light" because the defendant need only proffer a non-discriminatory reason, not prove it). "If the defendant articulates one

34

or more such reasons, the presumption of discrimination is eliminated." *Chapman* 229 F.3d at 1024 (11th Cir.2000).

Here, Volley decided that Jackson should be dismissed solely because of Volley's determination that Jackson had violated the Harassment Policy. (Doc. 15-1, p. 122, Volley Aff., ₽ 66.) Based on the information and materials provided to her by Harris, Volley determined that Jackson's actions were offensive to Jimenez and Williams and had created a hostile work environment towards Jimenez and Williams. (*Id*., ₽₽ 46-48.) Importantly, the evidence before Volley showed that Jackson's actions made Jimenez and Williams uncomfortable in entering the BOC Suite to complete their daily tasks. (*Id*.) And as an administrative assistant, Jackson's conduct towards visitors and staff in the BOC Suite was an important part of Jackson's job. (*Id*., ₽ 49.)

Notably, this Court has stated that "[c]ourts do not sit as a 'super-personnel department,' and it is not the court's role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1258 (11th Cir. 2010). Therefore, "if the employer fires an employee because it honestly believed the employee had violated a company policy, even if it was mistaken in such belief," the discharge does not violate federal law. *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987). Certainly,

35

whether conduct is offensive, intimidating, or qualifies as harassment is subjective. But it was not unreasonable for Harris and then Volley to reach the conclusion that Jackson's conduct amounted to harassment, especially when considering Jimenez's and Williams's statements that they considered the conduct offensive, intimidating, and that it made them uncomfortable to enter the BOC Suite. Indeed, at her deposition, Jackson stated that she would consider it "offensive" if "another employee repeatedly sprayed Lysol in [her] direction or on [her] person." (Doc. 15-3, p. 81, Jackson Dep., p. 71:13-16.) Accordingly, it cannot be said that Volley's determination that Jackson violated the Harassment Policy and created an offensive and hostile work environment was not a legitimate non-discriminatory reason for Plaintiff's dismissal. Thus, Sumter County is entitled to judgment in regard to Plaintiff's retaliation and discrimination claims, regardless of whether Plaintiff has stated a prima facie case for those claims.

## IV. Plaintiff cannot show that Sumter County's stated reason for Jackson's dismissal was pretext for discrimination and/or retaliation.

Because Sumter County has carried its burden of presenting a legitimate non-discriminatory reason for Jackson's dismissal, Plaintiff must "demonstrate that [Sumter County's] proffered reason was merely a pretext for unlawful discrimination [or retaliation]." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1221 (11th Cir. 2019). When an employer has presented a legitimate non-discriminatory reason for the employee's dismissal, "an employee must meet that reason head on and rebut

36

it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

"To establish pretext, a 'plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision.'" *Thompson v. Tyson Foods, Inc.*, 939 F. Supp. 2d 1356, 1369 (M.D. Ga. 2013) (quoting *Jackson v. State of Ala. State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir.2005)). "'[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* To carry their burden, a plaintiff must introduce "significantly probative evidence" showing "both that the [employer's] reason was false, and that discrimination was the real reason." *Walls v. Lowe's Home Centers, LLC*, 789 Fed. Appx. 852, 855 (11th Cir. 2019). Here, as the District Court concluded, Plaintiff has not carried that burden.

### 1. Volley had a reasonable basis to believe that Jackson violated the Harassment Policy and that dismissal was appropriate.

"The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)); *see also Davidson v. Chspsc LLC*, 861 Fed. Appx. 306, 311 (11th Cir. 2021); and *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000). To that end, "[t]he court is not in the business of judging whether

employment decisions are prudent or fair – rather, the court's sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Walls*, 789 Fed. Appx. at 855 (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) and *Chapman*, 229 F.3d at 1030). This Court has stated that the "question to be resolved is not the wisdom or accuracy of [an employer's decision], or whether the decision to fire [an employee] was 'prudent or fair.'" *Alvarez*, 610 F.3d at 1266; *see Rojas*, 285 F.3d at 1342. Instead, a court's "sole concern is whether unlawful discriminatory [or retaliatory] animus motivate[d] the decision." *Id*. (quotation marks and citation omitted). Here, Plaintiff's argument for pretext is in large part centered on his disagreement with the conclusion that Jackson violated the Harassment Policy; but Volley and Harris had a reasonable basis for concluding Jackson did. Thus, Plaintiff has not shown that discriminatory or retaliatory animus motivated Volley's decision to dismiss Jackson.

In her brief, Plaintiff characterizes the allegation levied against Jackson by Jimenez and Williams as Jackson merely spraying Lysol in her office. This is a mischaracterization to say the least. As discussed, the allegations against Jackson are that Jackson was spraying Lysol at or near Jimenez and Williams when they entered the BOC Suite for approximately two months. (Doc. 15-1, pp. 88-96, Sumter County's MSJ Memorandum, pp. 2-10.) It was alleged that this conduct was targeted at Jimenez and Williams and that Jackson sprayed Lysol at or near Jimenez and

38

Williams regardless of whether they were wearing a mask or not.  (*Id.*)  Rather than merely spraying Lysol in her office, Jimenez and Williams alleged that Jackson would get up from behind her work area and spray Lysol at or near them such that on at least one occasion the spray got on Williams's legs and dress and in Jimenez's mouth.  (*Id.*)  This was the behavior – not merely spraying Lysol – that Harris and Volley determined had violated the Harassment Policy.

Based on the evidence before her, Volley reasonably determined that Jackson had violated the Harassment Policy and that dismissal was appropriate.  Volley understood at the time that, according to the Harassment Policy, any conduct that has the effect of "creating an intimidating, hostile or offensive working environment"; "unreasonably interfering with an individual's work performance"; or "otherwise adversely affecting an individual's employment opportunities" can amount to harassment.  (Doc. 15-1, p. 116, Volley Aff., ¶ 38.)  Prior to deciding to dismiss Jackson based on her violation of the Harassment Policy, in addition to reviewing the April 12 Letter and the Investigation Memorandum in which Harris provided her finding that Jackson had violated the Harassment Policy, Volley also reviewed the materials that Harris provided Volley in support of her findings.  This includes:  the March 11 Email in which Jimenez stated that Jackson's conduct made her (Jimenez) and Williams feel uncomfortable going to the BOC Suite to do their daily tasks (Doc. 15-2, p. 120, Exh. B to Harris Aff., pp. 5-6); the March 14 Email

39

in which Jiminez stated that Jackson's behavior was "unacceptable and makes [Jimenez and Williams] uncomfortable to even enter the [BOC Suite] just to do [their] daily tasks" (*Id.*, Exh. B, p. 1); the March 21 Email in which Williams stated that "[s]he does not feel comfortable entering the [BOC Suite] to complete daily tasks for our Court due to [Jackson's] behavior" and that she (Williams) "feel[s] extremely uncomfortable entering the [BOC Suite] because of this issue" (*Id.*, Exh. H); and the McCants Statement in which another employee (McCants) supported Jimenez's and Williams's allegations (*Id.*, Exh. F). Volley also considered the fact that Jackson had not denied the allegations when Harris first met with her. (Doc. 15-1, p. 118, Volley Aff., ₽ 46.) From this, Volley had a reasonable basis to agree with Harris that Jackson had violated the Harassment Policy and created a hostile work environment.

Plaintiff further argues that Jackson's termination was not the appropriate discipline because (1) Volley overruled Harris's recommendation that Jackson only receive a written reprimand and (2) that Volley did not follow the progressive discipline policy outlined by the Policies and Procedures. These arguments, however, are without merit. First, Volley, and not Harris, had the authority to determine the appropriate discipline to be doled out to Jackson. (Doc. 15-1, p. 113, Volley Aff., ₽ 19; Doc. 15-2, p. 24, Harris Aff., ₽ 13.) And Harris herself testified that it was not unusual for a supervisor to disagree with her recommendation

40

regarding discipline. (Doc. 15-1, p. 113, Doc. 15-2, p. 25, Harris Aff., ¶ 14.) Further, although the Policies and Procedures call for a progressive discipline policy, they also provide that supervisors can dismiss employees when they deem it to be appropriate. Regarding discharges from employment, the Policies and Procedures state that "discharges for cause shall be initiated by the Supervisor . . . when alternative personnel actions . . . are not deemed sufficient, appropriate or in the best interest of the County." (Doc. 15-1, p. 117, Volley Aff., ¶ 42; Doc. 15-1, p. 147, Exh. A to Volley Aff., p. 23.) And here, based on the conclusion that Jackson violated the Harassment Policy and created a hostile work environment, and because Volley determined that Jackson's behavior showed her unfit to be the public face of Sumter County as administrative assistant to the Board, Volley determined that Jackson's conduct warranted dismissal from her employment. (Doc. 15-1, pp. 119-120, Volley Aff., ¶¶ 49-53.)

In essence, Plaintiff is arguing against the wisdom of Sumter County's decision to dismiss Jackson and that Jackson's dismissal was an extreme punishment. But this is not an appropriate inquiry. Again, this Court has stressed that courts "do not sit as a 'super-personnel department,' and it is not [the court]'s role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266. (quoting *Chapman*, 229 F.3d at

41

1030).  That is true "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." *Id*.

In short, merely because Plaintiff disagrees with Volley's decision and feels that Jackson's dismissal was not warranted, that does not show that the stated reason or her dismissal was pretext for discrimination or retaliation.  As such, Plaintiff cannot carry his pretext burden by showing that Sumter County's "reasons for firing [Jackson] were ill-founded but that unlawful discrimination was the true reason." *Id*. at 1267.

### 2.  The timing of Jackson's dismissal does not show pretext.

Like Plaintiff's "convincing mosaic" argument in support of his discrimination claim, Plaintiff relies on the timing of Jackson's dismissal in relation to the alleged protected activity to support his claim that Sumter County's proffered reason for Jackson's dismissal is pretext for retaliation.  Certainly, to the extent Jackson engaged in protected activity as it relates to Jackson informing Volley of her disability, seeking an accommodation in April 2022, and filing the Grievance, Jackson's dismissal was soon after these events.  However, the timing of Jackson's dismissal and her alleged protected activity must also be considered in context of the Investigation:  Jackson raised the issue of her disability in response to the allegations of harassment and hostile work environment.

42

Harris initiated the Investigation after receiving the complaints against Plaintiff on March 11, 2022. (Doc. 15-2, pp. 24-25, Harris Aff., ⁋⁋ 12, 15-17.) Harris met with Jackson on March 28, 2022 (the March 28 Meeting) to discuss the allegations against Jackson, and, in that meeting, Jackson did not deny the allegations. (Doc. 15-3, pp. 95-96, Jackson Dep., pp. 85:25-86:3; Doc. 15-2, p. 26, Harris Aff., ⁋ 27.) In Jackson's written response to the allegations (Jackson's Response), she raised the issue of her underlying health issues. (Doc. 15-2, p. 27, Harris Aff., ⁋ 31, Exh. K.) On April 12, 2022, Harris provided Volley with a letter (the April 12 Letter) that summarized her findings that Jackson had engaged in "unprofessional and offensive" behavior and "cause[d] and offensive and hostile work environment." (*Id*., Exh. L.) Then, in a meeting with Volley and Harris a few days after April 12, 2022 (the Initial Meeting), in response to the allegations against her, Jackson first informed Volley that she suffered from COPD, chronic kidney disease, and congestive heart failure that made her more vulnerable to COVID-19. (Doc. 15-1, p. 114, Volley Aff., ⁋ 23; Doc. 15-3, p. 59, Jackson Dep. 49:15-23.) Further, during this Initial Meeting, is when Jackson requested that the chair near her desk be moved, and Volley granted this request. (Doc. 15-3, p. 99-100, Jackson Dep., pp. 89:20-90:21; Doc. 15-1, pp. 114-115, Volley Aff., ⁋⁋ 28-29; Doc. 15-2, p. 29, Harris Aff., ⁋⁋ 44-45.) Jackson filed the Grievance on April 25, 2022 in response to the findings of the Investigation. (Doc. 15-1, pp. 238-240, Volley Aff., Exh. K.)

43

Thus, although there was a close temporal proximity between Jackson's alleged protected activity and her dismissal, the facts show that her protected activity was done in response to the Investigation that was already under way. Indeed, when Jackson informed Volley of her disability and requested an accommodation and filed the Grievance, Harris had already determined that Jackson had violated the Harassment Policy and created a hostile work environment. And Jackson does not dispute that this is a legitimate basis for dismissal. *See Alvarez*, 610 F.3d at 1270 ("We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint.").

In summary, Plaintiff has not carried his burden to show that Sumter County's stated reason for Jackson dismissal was pretext and that the real reason was discrimination or retaliation.

## CONCLUSION

Based on the foregoing, Sumter County is entitled to judgment as a matter of law as it relates to Plaintiff's discrimination and retaliation claims. Accordingly, this Court should affirm the District Court's grant of summary judgment to Sumter County.

Respectfully submitted this 5th day of January, 2026.

ALEXANDER & VANN, LLP

44

s/ H. Thomas Shaw
Raleigh W. Rollins
Georgia Bar No. 613860
rrollins@alexandervann.com
H. Thomas Shaw, Esq.
Georgia Bar No. 593166
tshaw@alexandervann.com
411 Gordon Avenue
Thomasville, Georgia  31792
Telephone:  229-226-2565
Facsimile: 229-228-0444
*Attorneys for Sumter County*

45

## CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(a)(7)(B), undersigned counsel hereby certifies this brief contains 10,586 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6).

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to FRAP 25(a)(2)(B)(i) and 11th Cir. R. 31-3, on January 5, 2026, I filed the foregoing with the Clerk of court using the CM/ECF system which will send notification of such filing to all counsel of record.


ALEXANDER & VANN, LLP

s/*H. Thomas Shaw*
Raleigh W. Rollins
H. Thomas Shaw
Attorneys for Sumter County